IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JOSEPH GLENN SAVICKI,
  Petitioner,

vs.         Case No.:  5:17cv18/MCR/EMT

JULIE L. JONES,
  Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (ECF No. 17).  Respondent filed an answer and relevant portions of the state court record (ECF Nos. 27, 28).  Petitioner filed a reply (ECF No. 32).  Petitioner subsequently filed a "Request for Discovery, Appointment of Counsel, Funds for Investigator" (ECF No. 35) and "Amendment to Request for Appointment of Counsel, Funds for Investigator, and Depositions be Transcribed" (ECF No. 36).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the

opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to federal habeas relief, and that Petitioner's pending motions should be denied.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 28).[1]  Petitioner was charged in the Circuit Court in and for Santa Rosa County, Florida, Case No. 2012-CF-313, with one count of lewd and lascivious molestation of a victim less than twelve years of age (Ex. A at 13).  Following a jury trial on May 23, 2013, he was found guilty as charged (Ex. A at 79, Exs. B, C).  At the conclusion of trial, Petitioner was sentenced, upon being designated a sexual predator, to a mandatory minimum term of twenty-five (25) years in prison, with jail credit of 443 days (Ex. A at 86–90, 95–96).  Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D13-2951 (*see* Ex. A at 101, Ex. E).  The First DCA dismissed the appeal on June 2, 2014, pursuant to Petitioner's notice of voluntary dismissal (*see* Ex. E).

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted by Respondent (ECF No. 28).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

On June 6, 2014, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. F at 66–94).  The state circuit court dismissed the motion for failure to comply with the oath and certification requirements of Rule 3.850 (Ex. G at 219–20).  The dismissal was without prejudice to Petitioner's filing an amended motion within sixty (60) days (*id.*).  Petitioner filed an amended motion on June 27, 2014 (*id.* at 236–70).  The circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing a second amended motion within sixty (60) days (Ex. H at  443–46).  Petitioner filed a second amended motion (*id.* at 455–78).  The court granted a limited evidentiary hearing and appointed counsel to represent Petitioner (Ex. I at 674–77).  At the commencement of the hearing, on August 18, 2015, Petitioner chose to represent himself (Ex. I at 730–800, Ex. J at 801–32).  Following the hearing, the state circuit court denied the second amended Rule 3.850 motion in an order rendered on December 15, 2015 (Ex. J at 902–34).  Petitioner appealed the decision to the First DCA, Case No. 1D16-0285 (Ex. P).  The First DCA affirmed the decision per curiam without written opinion on September 29, 2016, with the mandate issuing November 29, 2016 (Ex. U).  Savicki v. State, 203 So. 3d 162 (Fla. 1st DCA 2016) (Table).

During the pendency of the post-conviction appeal, Petitioner filed a successive Rule 3.850 motion in the state circuit court (Ex. V at 9–46). On March 17, 2016, the circuit court dismissed the motion for lack of jurisdiction, and alternatively, as impermissibly successive (*id.* at 110–12). Petitioner appealed the decision to the First DCA, Case No. 1D16-1900 (Ex. W at 356). The First DCA affirmed the decision per curiam without written opinion on September 16, 2016, with the mandate issuing November 10, 2016 (Ex. Y, AA). Savicki v. State, 202 So. 3d 412 (Fla. 1st DCA 2016) (Table).

On November 28, 2016, Petitioner filed a second successive Rule 3.850 motion in the state circuit court (Ex. BB at 7–25). The circuit court summarily denied the motion on January 12, 2017 (*id.* at 73–76). Petitioner appealed the decision to the First DCA, Case No. 1D17-1696  (*id.* at 1359–60). The First DCA affirmed the decision per curiam without written opinion on March 13, 2018, with the mandate issuing April 10, 2018. Savicki v. State, No. 1D17-1696, 2018 WL 1308747 (Fla. 1st DCA Mar. 13, 2018) (Table).

During the pendency of the appeal in First DCA Case No. 1D17-1696, Petitioner a third successive Rule 3.850 motion in the state circuit court (Ex. DD at 944–63). The circuit court initially held the motion in abeyance until the conclusion

of Petitioner's appeal in Case No. 1D17-1696 (Ex. CC at 921–22). On June 15, 2017, the First DCA relinquished jurisdiction to the circuit court to rule on Petitioner's third successive Rule 3.850 motion (Ex. EE). The court circuit summarily denied the third successive Rule 3.850 motion on July 10, 2017 (Ex. DD at 985–91). Petitioner appealed the decision to the First DCA, Case No. 1D17-3484. The First DCA affirmed the decision per curiam without written opinion on March 9, 2018, with the mandate April 18, 2018. Savicki v. State, No. 1D17-3484, 2018 WL 1223092 (Fla. 1st DCA Mar. 9, 2018) (Table). Petitioner filed a petition for writ of certiorari in the Florida Supreme Court, Case No. SC18-473. On April 26, 2018, the supreme court dismissed the petition for lack of jurisdiction. Savicki v. State, No. SC18-473, 2018 WL 1956395, at *1 (Fla. Apr. 26, 2018).

Petitioner filed the instant federal habeas action on January 20, 2017 (ECF No. 1).

II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254. Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> **(2)**  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue presented in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law,"

namely, "the governing legal principle or principles set forth by the Supreme Court

at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63,

71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established"

only when a Supreme Court holding at the time of the state court decision embodies

the legal principle at issue.  *See* Thaler v. Haynes, 559 U.S. 43, 47, 130 S. Ct. 1171,

175 L. Ed. 2d 1003 (2010); Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191

L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for

purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this

Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines

whether the state court adjudication is contrary to the clearly established Supreme

Court case law.  The adjudication is not contrary to Supreme Court precedent merely

because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only

if either the reasoning or the result contradicts the relevant Supreme Court holdings.

Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding

th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does

not even require awareness of our cases, so long as neither the reasoning nor the result

of the state-court decision contradicts them.").  Where there is no Supreme Court

precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See* <u>Woods</u>, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See* <u>Panetti v. Quarterman</u>, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's holdings.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court.  <u>Williams</u>, 529 U.S. at 409; *see* <u>Holland v. Jackson</u>, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  Harrington, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on an unreasonable fact finding.  *See* Gill v. Mecusker, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause, the federal court applies an objective test.  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  Federal courts "may not characterize . . . state-court factual

determinations as unreasonable merely because we would have reached a different conclusion in the first instance." Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See* Cave v. Sec'y for Dep't of Corr., 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." Gill, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits

of the petitioner's claims.  *See* <u>Panetti</u>, 551 U.S. at 954.  Even then, the writ will not

issue unless the petitioner shows that he is in custody "in violation of the Constitution

or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this standard is

difficult to meet, that is because it was meant to be."  <u>Richter</u>, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

A.    <u>Ground One:  "The process employed by the State courts for post-conviction relief is defective in light of the evidence presented."</u>

Petitioner alleges the state circuit court held an evidentiary hearing in the first

Rule 3.850 proceeding on August 18, 2015, and that the court appointed post-

conviction counsel, Attorney Jeremy Early, on June 9, 2015 (ECF No. 17 at 5–10).

Petitioner states that prior to the evidentiary hearing, he sent several letters to Attorney

Early requesting that he contact several witnesses and obtain evidence in support of

his post-conviction claims, but Attorney Early did not communicate with him until

August 12, 2015 (*id.*).  Petitioner alleges he also filed several motions in an attempt

to obtain evidence to support his post-conviction claims (*id.*).  Petitioner contends he

sought to obtain an offense report, dated November 28, 2011, which was the basis for

Stacy Williams' (the victim's mother) arrest for possession of methamphetamine on

April 27, 2012 (*id.*).  Petitioner alleges he also sought transcripts of the pre-trial

depositions of Stacy Williams, Michelle Zebracki, and Jerry Weekley (*id.*). Petitioner alleges he filed motions to discharge Attorney Early based upon Early's failure to communicate and failure to investigate the case (*id.*). Petitioner alleges the post-conviction court conducted a <u>Nelson</u>[2] hearing on the same day as the evidentiary hearing (*id.*). Petitioner alleges the court determined that Attorney Early was not ineffective, and gave Petitioner the choice of proceeding with Attorney Early or representing himself (*id.*). Petitioner states he chose to represent himself, with Attorney Early serving in a standby capacity (*id.*). Petitioner alleges after the evidentiary hearing, he again filed motions to obtain transcripts of the pre-trial depositions of Williams, Zebracki, and Weekley, as well as a copy of Ms. Williams' offense report, and to supplement the record with that evidence, but the court denied his motion (*id.*). Petitioner contends the circuit court's failure to discharge Attorney Early and appoint an alternate attorney rendered the post-conviction proceeding

---

[2] In <u>Nelson v. State</u>, 274 So. 2d 256 (Fla. 4th DCA 1973), the court held that where a defendant, before commencement of trial, requests discharge of his court-appointed counsel, the trial judge should make an inquiry of the defendant as to the reason for the request and, if incompetency of counsel is assigned as the reason, should make a sufficient inquiry of the defendant and his appointed counsel to determine whether there is cause to believe that counsel is not rendering effective assistance to the defendant. If reasonable cause for such belief appears, the trial judge should make a finding to that effect on the record and appoint substitute counsel, who should be allowed adequate time to prepare the defense. *Id.* at 259. If no reasonable basis for such belief appears, the trial judge should so state on the record and advise the defendant that if he discharges his original counsel, the State may not thereafter be required to appoint a substitute. *Id.*

unreliable (*id.*). Petitioner also contends the First DCA also violated his due process rights by granting the State's request for an extension of a filing deadline but not granting Petitioner's request (*id.*). Petitioner contends the process employed by the state court is defective and deprived him of the ability to provide necessary evidence to support his post-conviction claims (*id.*).

Respondent contends Petitioner's challenge to the state post-conviction process is not a cognizable basis for relief under § 2254 (ECF No. 27 at 12–15). Respondent further contends that ineffective assistance of post-conviction counsel is not a cognizable federal habeas claim (*id.*).

It is well established that due process violations that allegedly occur during state proceedings collateral to the trial proceeding do not form the basis of habeas relief. *See* <u>Carroll v. Sec'y, Dep't of Corr.</u>, 574 F.3d 1354, 1365–66 (11th Cir. 2009); <u>Quince v. Crosby</u>, 360 F.3d 1259, 1262 (11th Cir. 2004). A decision in a state collateral proceeding is not a criminal judgment, or executive agency equivalent, that resulted in the prisoner's detention. *See* <u>Carroll</u>, 574 F.3d at 1365 ("[A] challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment—i.e., the conviction itself . . . ."). Collateral proceedings are instead "civil in nature and are not part of the criminal proceeding itself." <u>Pennsylvania v.</u>

Finley, 481 U.S. 551, 556–57, 107 S. Ct. 1990, 1994, 95 L.Ed. 2d 539 (1987).

Therefore, procedural violations during state collateral proceedings are "issues

unrelated to the cause of the petitioner's detention." Spradley v. Dugger, 825 F.2d

1566, 1568 (11th Cir. 1987). As such, they cannot form the basis for habeas relief.

*See* Carroll, 574 F.3d at 1365 (holding that a failure to hold an evidentiary hearing in

a state post-conviction proceeding was not a basis for habeas relief); *see also* In re

Rutherford, 437 F.3d 1125, 1127 (11th Cir. 2006) (finding insufficient for habeas

relief the petitioner's claim that the state post-conviction court denied him due process

by failing to provide mental health records of a person the petitioner alleged had

actually committed the crime); Quince, 360 F.3d at 1262 (rejecting federal habeas

petition which alleged that the state judge presiding over the petitioner's

post-conviction hearing denied the petitioner due process by not recusing himself,

because the claim did not relate to the petitioner's conviction).

Additionally, the ineffectiveness or incompetence of counsel during state

collateral post-conviction proceedings is not a ground for federal habeas relief. *See*

28 U.S.C. § 2254(i). Petitioner failed to state a cognizable basis for federal habeas

relief; therefore, he is not entitled to relief on Ground One.

    B.    <u>Ground Two: "Ineffective assistance of counsel—failure to object to
unreliable, inadmissible, perjured Hearsay Rule Exceptions 90.803(23) [sic]."</u>

> Ground Six:  "IOC [sic]—failure to contact, interview, and present material witnesses."

> Ground Seven:    "IOC  [sic]—failure  to  conduct  any  pre-trial investigation."[3]

In Ground Two, Petitioner alleges that on October 2, 2012, the State filed a Notice of Intent to Offer Statements Qualifying as Hearsay Exception Under [Fla. Stat. §] 90.803(23) (ECF No. 17 at 12–21).  Petitioner alleges the hearsay statements at issue were (1) the child victim's statements during a forensic interview conducted by Leilani Mason, a Case Coordinator with the Child Protection Team ("CPT"), (2) the victim's statements to her mother, Stacy Williams, and (3) the victim's statements to her "aunt," Michelle Zebracki (*id.*).  Petitioner alleges defense counsel, Attorney Timothy Weekley, stipulated to admission of the statements, and waived a hearing to determine the reliability of the hearsay statements (*id.*).  Petitioner alleges Attorney Weekley stated at the post-conviction evidentiary hearing that he did not challenge admissibility of the statements, because he wished to show the inconsistencies of the statements; and Weekley testified that he was confident that the court would find the statements admissible (*id.*).  Petitioner contends if Attorney Weekley had challenged

---

[3] The court has consolidated these three claims because they were the subject of the state post-conviction evidentiary hearing, and they all relate to defense counsel's decisions regarding pre-trial investigation and presentation of the defense theory at trial.

the admissibility of the victim's hearsay statements, the trial court would have determined that the statements were unreliable and thus inadmissible (*id.*).  Petitioner contends Attorney Weekley's failure to challenge the admissibility of the victim's hearsay statements rendered the verdict unreliable (*id.*).

In Ground Six, Petitioner contends he provided Attorney Weekley, prior to trial, the names of several witnesses who (1) knew that the victim's mother, Stacy Williams, was biased against Petitioner because he called 911 to report that Mr. James Dean Dickerson kissed the 5-year-old victim, thus causing child protective services to become involved in Ms. Williams' life, (2) knew that Ms. Williams had fabricated the sexual molestation allegation against Petitioner so she could steal his used electronics and sell them to support her drug habit, and (3) "may reveal" that someone other than Petitioner committed the sexual molestation (ECF No. 17 at 36–41; ECF No. 32 at 39–43).  Petitioner identifies these witnesses as (1) Joshua Leach, a deputy who observed items of Petitioner's personal property, as well as an illegal substance, in Stacy Williams' bedroom four days after Williams reported the sexual molestation, (2) Tarah C. Freeman, who warned Petitioner to "watch his back" in relation to Ms. Williams, and (3) officers who responded to Petitioner's 911 call regarding James Dean Dickerson (*id.*).  Petitioner alleges Attorney Weekley was ineffective for failing

to contact these witnesses and present their testimony at trial (*id.*). Petitioner contends the jury would have had reasonable doubt about his guilt if the jury had heard this testimony (*id.*).

In Ground Seven, Petitioner contends Attorney Weekley was ineffective for failing to investigate James Dean Dickerson, and present evidence that Mr. Dickerson may have been the person who molested the victim, if indeed the molestation occurred (ECF No. 17 at 42–45; ECF No. 32 at 44–51). Petitioner alleges he told Attorney Weekley that he saw Mr. Dickerson kiss the 5-year-old victim on the lips, and Petitioner called 911 and reported this information on August 28, 2011 (*id.*). According to the 911 dispatch records, the responding officer interviewed Petitioner and Mr. Dickerson and determined that Petitioner "believed something was going on that was not" (Ex. H at 505–07). Petitioner contends this evidence could have raised reasonable doubt in the minds of the jurors (ECF No. 17 at 42–49).

Petitioner additionally alleges that Attorney Weekley also failed to present evidence that Ms. Williams was a drug addict and fabricated the allegation against Petitioner in order to get him out of the apartment so she could sell his used electronics to support her addiction (ECF No. 17 at 45–49; ECF No. 32 at 44–51). Petitioner alleges on November 24, 2011, when police came to the apartment where

Petitioner and Ms. Williams were living and informed Petitioner that Ms. Williams had filed the complaint of sexual molestation, Petitioner photographed his personal property and locked his bedroom door (*id.*).  Petitioner alleges four days later, he returned to the apartment with police to assist him in retrieving his personal property, and he discovered his bedroom had been ransacked, and some of his property was found in Ms. Williams' bedroom (*id.*).  Petitioner alleges the police also discovered methamphetamine in Ms. Williams' bedroom (*id.*).  Petitioner alleges this evidence would have created reasonable doubt in the minds of the jurors (*id.*).

Petitioner contends the state post-conviction court's adjudication of these ineffective assistance of trial counsel ("IATC") claims was based upon an unreasonable factual determination, specifically, its determination that Attorney Weekley's testimony at the evidentiary hearing was credible (ECF No. 17 at 12–21, 37–41; ECF No. 32 at 10–27, 39–51).  Petitioner also contends the state court's determinations, that Attorney Weekley made sound strategic decisions, and that Petitioner was not prejudiced by counsel's alleged errors, were unreasonable, because the court did not permit Petitioner to present witnesses in support of his claims (*id.*).

Respondent concedes Petitioner exhausted these three IATC claims in the state courts (*see* ECF No. 27 at 15–16, 30, 41–42).  Respondent contends the state court's

adjudication of the claims was not contrary to or an unreasonable application of federal law (*id.* at 16–19, 30–45).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set out in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms.  Strickland, 466 U.S. at 688–89, 691.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

To be found deficient, trial counsel's performance must be "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. Professionally competent assistance includes a duty to conduct a reasonable investigation. Id. at 690–91. The Supreme Court has emphasized that only when counsels' choices are made after a "thorough investigation of law and facts relevant to plausible options" are those choices "virtually unchallengeable." Id. at 690. When, however, "strategic choices [are] made after less than complete investigation [they] are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690–91. The bottom line is that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular

decision not to investigate must be directly assessed for reasonableness in all the circumstances. . . ." *Id.* at 691. This means that when a court assesses the attorney's decision not to investigate, it "must consider . . . whether the known evidence would lead a reasonable attorney to investigate further." <u>Wiggins v. Smith</u>, 539 U.S. 510, 527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that <u>no reasonable lawyer</u>, in the circumstances, would have done so." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994) (emphasis added).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high. *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>Jones v. GDCP Warden</u>, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting <u>Strickland</u>, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the

likelihood of a different result is substantial, not just conceivable. <u>Williamson v. Fla.</u>

<u>Dep't of Corr.</u>, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing <u>Richter</u>, 562 U.S. at 112).

"When a defendant challenges a conviction, the question is whether there is a

reasonable probability that, absent the errors, the factfinder would have had a

reasonable doubt respecting guilt." <u>Strickland</u>, 466 U.S. at 695.  The prejudice

assessment does "not depend on the idiosyncracies of the particular decisionmaker,"

as the court should presume that the judge or jury acted according to law. *Id.* at

694–95.  Further, when the claimed error of counsel occurred at the guilt stage of trial

(instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial,

not on appeal. *See* <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing

<u>Strickland</u>, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's

findings of historical facts in the course of evaluating an ineffectiveness claim are

subject to the presumption of correctness, while the performance and prejudice

components are mixed questions of law and fact. *See* <u>Strickland</u>, 466 U.S. at 698;

<u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting <u>Strickland</u>'s

high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371, 130 S. Ct.

1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of

Strickland was unreasonable under § 2254(d) is all the more difficult." Richter, 131 S. Ct. at 788.  As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Id.* (citations omitted).

> 2.    Federal Review of State Court Decision

Petitioner presented these IATC claims as Claims #1, #6, and #7 of his second amended Rule 3.850 motion (Ex. G at 456–59, 465–72).  In the state circuit court's written decision denying the claims, the court correctly stated the deficient performance and prejudice prongs of the Strickland standard as the applicable legal standard (Ex. J at 904–05).  The court adjudicated the claims as follows:

### Claim One—Failing to Challenge Out-Of-Court Hearsay Statements of Child Victim

> Defendant claims that counsel was ineffective for failing to challenge the out-of-court hearsay statements of the child victim. Defendant further alleges that counsel was ineffective for waiving the required section 90.803(23) hearing to determine the reliability of the child victim's hearsay statements without Defendant's consent.

This claim was addressed at the evidentiary hearing.[FN 8] Counsel testified that he had several reasons for not objecting to the hearsay rule exceptions under section 90.803(23), Florida Statutes. First, counsel expected the Court to permit into the evidence the Child Protection Team (CPT) interview, especially since the child victim was anticipated to, and did testify at trial.[FN 9]  Secondly, the State was planning on withdrawing portions of its motion for child hearsay. The defense theory was to attack the credibility of Stacy Williams (the child victim's mother) and the child victim, and to stand by the assertion that the alleged incident did not occur and Defendant was not guilty.[FN 10] As discussed with Defendant, counsel wanted to get all of the different versions of the child hearsay statements into evidence.[FN 11]  In order to accomplish this, counsel wanted "everything to come in for as many different possible versions and variations."[FN 12]  Counsel was confident that the statements would meet the constitutionally mandated safeguards of reliability because the main part of the child hearsay was from the CPT interview, and then there were disclosures made to other family members.[FN 13]  Counsel confirmed that he absolutely wanted to bring out the inconsistencies that were present in the child's testimony from statement to statement.[FN 14]  Counsel further confirmed that if the State had not filed a notice of intent to present child hearsay, he still would have wanted the child hearsay statements to come into evidence so he could use the statements to impeach the child victim.[FN 15] Counsel testified that Defendant knew of this theory and agreed to counsel's strategy of letting the child hearsay statements in without objection.[FN 16]  In fact, Defendant encouraged counsel to attack the statements, to attack the CPT interview, and to attack the credibility of the mother.[FN 17]  Counsel testified that in essence, everything Defendant asked counsel to do as a defense was to attack the credibility, mainly of the mother, Ms. Williams.[FN 18]  In counsel's opinion this technique was successful because "the mother's credibility was absolutely and totally destroyed."[FN 19]  Counsel further opined that "[t]he bottom line is the jury, at the end of the day, didn't believe the child hearsay because it was on a video or because it came through the testimony of another person.  They did not believe, in my opinion, anything that the mother of the alleged victim had to say.  The conviction

came back because they believed the testimony, in person, in court, of the little girl."[FN 20]

The Court finds counsel's testimony credible regarding this claim. As the evidence at [the] hearing shows that Defendant knew and was in agreement with counsel's sound trial strategy of bringing out the inconsistencies in the child hearsay statements, the Court finds that counsel was not deficient, nor was Defendant prejudiced by counsel's failure to challenge the child hearsay statements.  Defendant is not entitled to relief as to this claim.

> [FN 8:  Defendant chose to represent himself at the evidentiary hearing despite being appointed counsel.  See Transcript, Evidentiary Hearing, August 18, 2015, pp. 2–26. While Defendant offered argument in support of the claims set for evidentiary hearing, Defendant failed to present any evidence (including testimony) to support his claims.]

## Claim Six—Failing to Call, Interview, and Present Material Witnesses

Defendant next alleges that his counsel was ineffective by failing to call, interview, and present material witnesses.  Specifically, Defendant alleges that if:  a) Tarah C. Freeman; b) Iesha Rochelle Gooden; c) Raymond Lloyd Tiller; d) Richard Henry Stephens; e) James Dean Dickerson; f) the officers who investigated Defendant's 911 call; and g) the officers involved in Defendant's November 28, 2011 standby had been called on Defendant's behalf at trial, the results of his trial would have been different.

An evidentiary hearing was convened regarding this claim as it pertains to Ms. Freeman, Ms. Gooden, Mr. Tiller, and Mr. Stephens. Counsel testified that Defendant made him aware of these alleged proposed witnesses.[FN 39]  Counsel confirmed that he had made the decision not to contact any of these potential witnesses based on what Defendant had said about them, "both what they would say, their

characteristics, their attitude toward" Defendant.[FN 40]   The Court finds that counsel's testimony is credible and his strategy sound in not contacting these four witnesses.  As addressed in greater detail below, the Court finds that Defendant is not entitled to relief as to the entirety of this claim.

### a.  Tarah C. Freeman

Defendant alleges that his counsel should have called Tarah C. Freeman, a former roommate, who would have testified she had warned Defendant that Ms. Williams (the mother of the child victim) was going to "set him up."   Ms. Freeman would have also testified that Ms. Williams was telling people Defendant had molested her child.  Ms. Freeman would have further testified that James Dean Dickerson lived at the same residence as Defendant and Ms. Williams; there were several other roommates that lived at Ms. Williams' residence; she had heard Defendant threaten Ms. Williams with calling Department of Children and Families (DCF); and the one time Ms. Freeman had seen Defendant and the child victim together, she did not witness anything inappropriate. Ms. Freeman would have also confirmed that on November 24, 2011 ("Thanksgiving") Defendant texted Ms. Freeman that Ms. Williams had filed a complaint, to which Ms. Freeman responded she had warned him.

Contrary to Defendant's allegations, counsel testified Defendant never told him that Ms. Freeman would testify he was being "set up" by Ms. Williams.[FN 41]  Counsel confirmed that for the first few months of Defendant's correspondence with counsel, Defendant stated Ms. Freeman had told him a few weeks before the report of abuse was filed that Ms. Williams was telling people Defendant had molested her daughter.[FN 42] Counsel further confirmed Defendant consistently told counsel that Ms. Freeman had told Defendant to watch his back.[FN 43] Counsel also testified that it was Defendant who drew a conclusion in later letters that Ms. Freeman telling him to watch his back must have been a sign from her that Defendant was being "set up."[FN 44]

Counsel testified that in evaluating whether the testimony would be helpful at trial, counsel took into account that Defendant told him Ms. Freeman had been evicted from Ms. Williams' home.[FN 45]  Counsel further testified that he reviewed a DCF report showing Ms. Williams told DCF she had kicked several people out her house for drug use.[FN 46] Counsel further took into account that Defendant had characterized Ms. Freeman as being part of the group that Defendant referred to as a drug addicts.[FN 47]   Counsel testified that he determined Ms. Freeman's proposed testimony would have probably only served to impeach the credibility of Ms. Williams.  However, counsel surmised from the information provided by Defendant that Ms. Freeman's testimony could have been impeached by Ms. Williams on rebuttal evidence by the State.[FN 48]

Counsel also noted that although Defendant alleges in his rule 3.850 motion that Ms. Freeman was available to testify, in Defendant's correspondence to counsel he had asked counsel to inform Ms. Freeman how long Defendant had been in jail and the penalty Defendant was facing.[FN 49] Defendant also instructed counsel to act as though he had copies of the text messages between Defendant and Ms. Freeman in which she warned Defendant to watch his back.[FN 50]  Defendant indicated that if counsel did not do all of these things, Ms. Freeman might not cooperate.[FN 51]

Counsel confirmed that Defendant told counsel that Ms. Freeman had observed Defendant with the child victim and had not observed any odd reactions by the child victim to Defendant.[FN 52]   However, counsel testified there was "an ethical reason for which I would not have been able to call her to testify to that."[FN 53] Ultimately counsel determined that calling Ms. Freeman would not have helped Defendant's case.[FN 54]  "It was not a silver bullet or a smoking gun without some other admission from [Ms. Williams], which never came."[FN 55]

The Court finds the entirety of counsel's testimony regarding Ms. Freeman credible.  The Court further finds that Defendant never told counsel Ms. Freeman warned him that Ms. Williams was going to "set

him up." Even if Ms. Freeman had offered the vague statement that Ms.
Williams was trying to set up Defendant, it is questionable whether this
testimony would have been admissible at trial. The Court also finds that,
contrary to Defendant's allegations, Ms. Freeman was not available and
willing to testify at Defendant's trial. The Court finds that counsel
clearly made a strategic decision not to contact Ms. Freeman based upon
the information Defendant provided to counsel. Ms. Freeman's
testimony could have easily been impeached, and even if it were not, Ms.
Freeman's testimony could have only served to impeach Ms. Williams'
testimony, which had already been accomplished. Ms. Freeman's
proposed testimony simply would not have made a difference in the
result[] of Defendant's trial. Defendant has failed to show that counsel
was deficient or that Defendant was prejudiced by counsel's failure to
contact Ms. Freeman and have her testify at Defendant's trial. Defendant
is not entitled to relief as to this claim.

**b.  Iesha Rochelle Gooden**

Defendant alleges counsel should have called Iesha Rochelle
Gooden, a former roommate, who would have testified she had seen
Defendant and the child victim together once and the child did not have
a reaction to Defendant's presence. Defendant further alleges that Ms.
Gooden would have testified that Ms. Williams and Defendant argued
about Ms. Williams' lifestyle and Defendant had threatened to call DCF.
Defendant further contends that Ms. Gooden would have testified that
Ms. Williams would spend the night in Defendant's room; Ms. Williams
had talked about setting Defendant up; and Ms. Williams had broken into
Defendant's room and stolen several items after Defendant was forced
to leave the residence by law enforcement.

An evidentiary hearing was convened regarding this allegation.
Counsel testified that he was aware that Ms. Gooden was a former
roommate of Defendant's who had been "kicked out" by Ms. Williams
from the residence prior to the allegations against Defendant.[FN 56]
Counsel further testified that Defendant informed counsel that Ms.
Gooden was the girlfriend of Raymond Tiller.[FN 57]  When being

questioned by Defendant at [the] evidentiary hearing, counsel revealed that "Raymond Tiller is a person that you told me had told another person that you admitted to him that you had done it."[FN 58]  Counsel indicated he did not believe it would be in Defendant's best interest to attempt to contact Ms. Gooden because he had "no interest" in trying to find a witness who could lead the State to someone who would make the allegation that Defendant had made an admission to the crime.[FN 59] Defendant had also warned counsel that one of the ways to find Ms. Gooden was to go through Mr. Tiller, who was being housed at the Santa Rosa County Jail.  Counsel testified that from Defendant's description of Mr. Tiller as a "reluctant hostile witness," he did not want to call anybody as a witness who was connected to Mr. Tiller.[FN 60] Counsel further testified that he did not believe Ms. Gooden's testimony would have been of any great evidentiary value to establish Ms. Williams was motivated to report Defendant because of threats of DCF involvement. Counsel testified that from what he had reviewed before trial, DCF was constantly being called on Ms. Williams.[FN 61]

The Court finds counsel's testimony wholly credible on the reason he did not attempt to contact Ms. Gooden.  The Court further finds that counsel exercised sound trial strategy in not contacting Ms. Gooden. Contacting Ms. Gooden would not have been in Defendant's best interest.  As Defendant has failed to demonstrate that counsel was deficient or that Defendant was prejudiced, Defendant is not entitled to relief to this claim.

### c.  Raymond Lloyd Tiller

Defendant alleges that counsel should have called Raymond Lloyd Tiller, a former roommate, who would have testified that Ms. Williams and Defendant argued; Defendant threatened to call DCF on Ms. Williams, and Ms. Williams slept in Defendant's bedroom.  Defendant further claims that Mr. Tiller would have testified that the child victim did not live at the house with Ms. Williams and he had never seen Defendant and the child victim at the apartment at the same time. Defendant further contends that Mr. Tiller would have testified that Ms.

Williams broke into Defendant's room on November 24, 2011, after Defendant was "made to leave" by Milton police.  Mr. Tiller would have further testified that Ms. Williams and the child victim were not at the apartment on November 24, 2011, until after Ms. Williams had contacted the Milton police.

An evidentiary hearing was convened regarding this claim. Counsel testified that because Defendant informed counsel that Mr. Tiller had told someone else that Defendant had admitted to committing the crime, he did not believe he was doing Defendant "any favors" by locating Mr. Tiller.[FN 62]  Counsel also testified he did not believe it was wise to contact Mr. Tiller when Defendant told counsel he should "proceed with caution" because Mr. Tiller would be a "reluctant hostile witness," and if he knew counsel was contacting him on Defendant's behalf, Mr. Tiller would not help.[FN 63]  Counsel asked Defendant at [the] hearing, even if he assumed for a moment Mr. Tiller may have seen the few small things that might further impeach the credibility of Ms. Williams, "why would we open the door to the possibility that the State may elicit from [Mr. Tiller and Ms. Gooden] alleged admissions that you made about what you're charged with?  That has no logic."[FN 64] Counsel clarified that he made his decision not to contact Mr. Tiller based on not only what Defendant told counsel about the situation, but also on what Defendant told Mr. Russell and Ms. Edwards, Defendant's previous counsel.[FN 65]  Counsel had the benefit of the full file and all of Defendant's statements made to counsel and to all of Defendant's previous attorneys when he made the decision not to call Mr. Tiller.[FN 66]

The Court finds counsel's testimony credible.  Counsel was fully informed and exercised sound discretion when determining it would defy logic to contact Mr. Tiller to testify on Defendant's behalf. Defendant has failed to demonstrate that counsel was deficient or that Defendant was prejudiced.  Defendant is not entitled to relief as to this claim.

## d.  Richard Henry Stephens

Defendant alleges that Richard Henry Stephens, who was also a former roommate of Defendant, would have testified that James Dickerson was permitted to move to an upstairs bedroom.  Defendant further alleges that Mr. Stephens would have testified that Ms. Williams and Defendant argued about Mr. Dickerson moving in.  Mr. Stephens was also aware that Defendant threatened to call DCF.  Additionally, Stephens would have testified that the child victim was not living at the residence; he never saw Defendant and the child victim at the apartment at the same time.

An evidentiary hearing was convened regarding this assertion. Counsel testified that Defendant informed him that Mr. Stephens was Ms. Williams' boyfriend, who was a sex offender that was not supposed to be living at that address.[FN 67]  In response to Defendant's question as to whether Mr. Stephens would have testified that Defendant threatened to call DCF on Ms. Williams, counsel testified he did not believe Mr. Stephens would be willing to testify on Defendant's behalf as it would have required Mr. Stephens admitting he was present at a prohibited location.[FN 68]  Counsel further explained he based this opinion on Defendant's letters informing counsel Mr. Stephens was a sex offender living with Ms. Williams.[FN 69]

The Court finds counsel's testimony credible and his strategy sound in not calling Mr. Stephens to testify.  The Court agrees with counsel that it is highly unlikely Mr. Stephens would have implicated himself in another crime by testifying on Defendant's behalf.  The Court finds that counsel's actions were not deficient and Defendant has failed to demonstrate he was prejudiced by counsel's actions.  Defendant is not entitled to relief as to this claim.

### e.  James Dean Dickerson

Defendant next alleges that James Dean Dickerson, a former roommate, would have testified that Defendant did not want Mr. Dickerson living at Ms. Williams' residence.  Defendant also contends that Mr. Dickerson woul have testified the child victim did not live at the

residence and he never saw the child victim and Defendant at the residence at the same time.

Defendant is not entitled to relief as to this claim. Even if counsel had called Mr. Dickerson to testify to the testimony alleged by Defendant, it would not have made a difference at Defendant's trial. The substance of Mr. Dickerson's proposed testimony has no bearing on whether Defendant committed the crime in question. As Defendant cannot show he was prejudiced by counsel's failure to offer testimony that would have been of no assistance to Defendant's case. Defendant is not entitled to relief as to this claim.

### f.  Officers Who Investigated Defendant's 911 call

Defendant next alleges that counsel should have called the officers who investigated the 911 call placed by Defendant on August 28, 2011. Defendant alleges the officers would have testified that Defendant told them Ms. Williams had seen Mr. Dickerson kissing the sleeping child victim, "like a man kisses a woman."

This claim is facially insufficient. Initially, indentifying [sic] the persons as "officers" is not an adequate identification of the purported witnesses. See Austin v. State, 762 So. 2d 558, 558 (Fla. 4th DCA 2000). The Court has reviewed the 911 call report attached to Defendant's motion and finds that the officers are not identified on the report. Consequently, counsel would not have had the proper information to try to obtain the testimony from the unidentified "officers."

Even if the claim were facially sufficient, Defendant would still not be entitled to relief. Testimony regarding an ancillary event regarding someone else kissing the child victim would have done nothing to refute the fact that the child victim identified Defendant as the person who molested her. Additionally, counsel testified that he and Defendant discussed the possible defense of raising the issue with Mr. Dickerson and shifting the blame to him. However, counsel indicated

"[w]e elected not to do that because the allegations against the James person were different than the allegations against [Defendant]. For example, the allegations against James occurred in a common living area with several children present in front of a television while the child slept. The allegations against [Defendant] were isolated to [Defendant's] room and [the child victim] only."[FN70] The Court finds counsel's testimony credible regarding this issue. Defendant has failed to demonstrate that counsel sas deficient and that Defendant was prejudiced by the officers not being called. Defendant is not entitled to relief as to this claim.

### g. Officers involved in Defendant's November 28, 2011 Standby

Defendant also alleges that counsel should have called the Milton Police Department Officers and the Santa Rosa Sheriff's Office Officers who were involved in Defendant's civil standby on November 28, 2011. Defendant alleges the officers would have testified that Ms. Williams was "visibly high" when the officers arrived at the apartment to let Defendant in to collect his belongings. Defendant further alleges the officers could have testified that some of Defendant's personal items were found in Ms. Williams' room even though she denied taking any of Defendant's belongings.

This claim as presented prior to [the] evidentiary hearing[FN 71] appears to be facially insufficient as Defendant fails to identify the proposed witnesses by name. See Austin v. State, 762 So. 2d 558, 558 (Fla. 4th DCA 2000). The Court has reviewed the police report regarding this incident attached as an exhibit to the motion: the officers are not identified. Consequently, counsel would not have had the proper information to try to obtain the testimony from the unidentified "officers."

[FN 71: After [the] evidentiary hearing Defendant submitted "Defendant's Supplemental/Amended Discovery Exhibit O in support of Defendant's 3.850," filed October 7, 2015; and "Amended Discovery Exhibit N," filed September 22, 2015. In the October 7, 2015 pleading with

attached exhibits, Defendant now alleges the name of the deputy who arrested Ms. Williams, and who presumably would have been one of the officers present during Defendant's standby. The Court finds that while Defendant was given leave to file written closing arguments after the hearing, he was not permitted leave to submit additional allegations or evidence for the Court's consideration. Consequently, both of these pleadings with attached exhibits are inappropriately filed and will not be considered by the Court. Even if they were considered, neither of these exhibits would have made a difference in the result of Defendant's trial.]

Even if this claim were not facially insufficient, Defendant would still not be entitled to relief. Initially, Ms. Williams admitted from the stand that she was a drug addict.[FN 72] Testimony from a third-party observing Ms. Williams under the influence of drugs would not have added any additional information to the trial. Additionally, the fact that Ms. Williams might have taken some of Defendant's belongings after he was arrested on these charges is an ancillary matter that has no bearing on whether Defendant committed the offense. As testified to by counsel at the evidentiary hearing, counsel strategically decided not to pursue this defense because "[q]uite frankly, I don't think that it is a motivation to make a serious claim against someone in order to steal an Xbox or a television."[FN 73]  Counsel later expounded on his explanation by testifying "If I recall the items, there were a couple of gaming systems and a television. I would not have felt comfortable pursuing that as a theory of defense, for a jury, to say that [Ms. Williams] was enticing her daughter to make accusations against [Defendant], and putting her through the stress of a trial to testify against [Defendant] for a couple of used gaming systems and other electronics."[FN 74]  Counsel also indicated he did not know who the officer was that charged Ms. Williams with drug possession that night, but that he had in fact talked to a number of officers related to the case.[FN 75]  The Court finds counsel's testimony credible. Defendant has failed to demonstrate that counsel

was deficient and that Defendant was prejudiced by these officers not being called. Defendant is not entitled to relief as to this claim.

## Claim Seven—Failing to Conduct Pre-Trial Investigation

Defendant also alleges that counsel was ineffective for failing to conduct "any" pre-trial investigation. Specifically, Defendant alleges that he explained to counsel that the allegations were lodged against him because Ms. Williams wanted revenge and monetary gain. Specifically, Defendant claims Ms. Williams wanted revenge because Defendant had involved law enforcement and DCF in her life on August 28, 2011, when he called 911. Defendant further alleges Ms. Williams wanted revenge because he had threatened to call DCF and report Ms. Williams' drug use. Defendant claims that Ms. Williams would gain monetarily by the allegations because she could steal the items from Defendant's room after his arrest and trade the property to support Ms. Williams' drug addiction.

Defendant also claims that he told counsel Ms. Williams was arrested in April 2012 for drug offenses which resulted from information Defendant gave the authorities on November 28, 2011. Defendant claims that he requested his counsel to investigate whether Ms. Williams was promised anything for her testimony.

Defendant also claims that the child victim made other allegations of abuse against her uncle, Jerry Weekley and her grandfather, Eddie Weekley, before Defendant's trial. Defendant alleges he urged counsel to investigate to see if maybe the Weekleys were attempting to maintain custody of Ms. Williams' children, and if possibly Ms. Williams might have influenced the child victim to make allegations against them.

Defendant claims that four days before trial, on May 19, 2013, counsel informed Defendant he had not conducted investigation into these matters because he assumed the attorney prior to him had already investigated these concerns. Defendant claims that if counsel had

investigated and presented the pertinent evidence, the jury would not have found Defendant guilty.

An evidentiary hearing was convened regarding this multi-part claim. The evidence submitted at evidentiary hearing established that counsel was aware of Defendant's theories of revenge and monetary gain, and he did not see a need to further investigate those situations.[FN 76] As discussed in great detail, counsel testified he considered the theories of revenge and monetary gain but determined that neither of these trial strategies would assist Defendant at trial.[FN 77]

In regard to Defendant's claim regarding whether Ms. Williams was promised anything for her testimony, counsel testified he understood Ms. Williams was arrested prior to Defendant's trial but he did not look into whether he State was making her testify as a result of her arrest.[FN 78] However, such failure to look into to the issue was not prejudicial to Defendant. A large portion of counsel's defense theory was to show Ms. Williams was not credible. Even the trial judge indicated during a bench conference that Ms. Williams' credibility had been impeached.[FN 79] If Ms. Williams had brokered a deal to testify at Defendant's trial, this information would have only been used by the defense for impeachment purposes. As counsel had already impeached Ms. Williams' credibility at trial, whether Ms. Williams had been promised anything in exchange for her testimony is of no real consequence.

As to Defendant's claim regarding additional allegations of abuse against others, counsel testified at [the] evidentiary hearing that he did not recall telling Defendant there had been new allegations of abuse made by the child victim against Eddie and Jerry Weekley.[FN 80] Counsel knew that Defendant had referenced such in a couple of his letters, but counsel could not recall whether any new allegations had actually been brought by the child victim.[FN 81] The Court finds counsel's testimony credible. At [the] hearing, Defendant failed to present any evidence showing that new allegations of abuse actually had been made by the child victim against Eddie and Jerry Weekley. Even

> if such allegations had been made, Defendant has failed to show how such information would have been admissible evidence at trial. Defendant has failed to demonstrate that counsel acted deficiently and Defendant was prejudiced. He is not entitled to relief.

(Ex. J at 906–08, 915–30) (footnotes citing to trial transcript and evidentiary hearing transcript omitted). The First DCA affirmed the decision without written opinion (Ex. U).

The state court's factual findings with respect to the content of the testimony adduced at Petitioner's trial and at the post-conviction evidentiary hearing are supported by the transcripts of those proceedings (*see* Exs. B, C, I at 730–800, J at 801–32). Therefore, the court will defer to those factual findings.

The state court's factual finding that the testimony of Petitioner's trial counsel, Timothy Weekley, was credible is also entitled to deference. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); *see also* Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree

about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")). Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983); *see also* Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998); Smith v. Kemp, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing."). Questions of the credibility and demeanor of a witness are questions of fact. *See* Consalvo, *supra* (citing Freund v. Butterworth, 165 F.3d 839, 862 (11th Cir. 1999) (en banc)). "The deference compelled by the AEDPA requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations." Nejad v. Attorney, 830 F.3d 1280, 1292 (11th Cir. 2016) (internal quotation marks and citation omitted). Instead, "[i]n the absence of clear and convincing evidence, [courts] have no power on federal habeas review to revisit the state court's credibility determinations." *Id.* (emphasis in original) (citation omitted).

Petitioner contends the state court's credibility finding is unreasonable, because Attorney Weekley gave "false" testimony at the evidentiary hearing (*see* ECF No. 17 at 17–18; ECF No. 32 at 18).  As one example, Petitioner asserts Attorney Weekley testified that during the victim's recorded forensic interview with CPT Case Coordinator Leilani Mason, the victim was questioned about her understanding of the difference between telling the truth and telling a lie (*see* Ex. I at 800, Ex. J at 801), but the transcript of the interview (included in the trial transcript) showed that Ms. Mason did not question the victim about her understanding of the difference between telling the truth and telling a lie (*see* Ex. B at 77–95).

The transcript of the evidentiary hearing shows that the context of Attorney Weekley's allegedly false testimony was the following:

> Q (by the Defendant)  And per your recollection, was [the victim] issued an oath in the DVD interview—the forensic interview?
>
> A.  No, she was not.  She was given the same sort of questions about understanding the difference between telling the truth and telling a lie that Judge did prior to her testimony at trial.  That is very common. I did not have a problem with that.

(Ex. I at 800, Ex. J at 801).

The transcript of the CPT interview reflects that at the beginning of the interview, Ms. Mason asked the victim the following:

       MS. MASON:  Okay.  So there are some really important things about this room I want to tell you.  Okay?  And the first thing and the most important thing is that in this room we only talk about the truth and about things that really happened.  Can you do that today?

       THE CHILD:  (Indicates affirmatively).

(Ex. B at 79).  At the conclusion of the interview, Ms. Mason asked the victim the

following:

       MS. MASON:  Has everything we talked about today been the truth and everything really happened?

       THE CHILD:  (Witness indicates positively).

(Ex. B at 95).

      At the beginning of the victim's trial testimony, the prosecutor asked the

following:

       Q.  All right. . . . [D]o you know what it means to tell a lie?

       A.  Kind of.

       Q.  Well, if I told you that my suit is pink, would that be the truth or would that be a lie?

       A.  A lie.

       Q.  Why would that be a lie?

       A.  Because it's black.

Q.  If you don't tell the truth, what can happen?  Could you get in trouble?

A.  (Witness indicates affirmatively).

Q.  This man that's sitting up here at the bench, what do you think would happen if you told him a lie?

A.  (Witness shrugs shoulders) .

Q.  Do you think you would get in trouble if you told him a lie?

A.  (Witness indicates affirmatively).

Q.  You have to answer out loud for us.

A.  Yes.

Q.  And . . . can people get hurt if you tell lies about them?

A.  No.

Q.  If you were to say that someone did something to you and they really didn't, could that person get in trouble?

A.  Uh-huh.

Q.  Do you understand what I'm asking?

A.  Yes.

Q.  Can you hurt someone if you tell a lie about them?

A.  I don't know.

Q.  Well, if you said that someone did something to you and it wasn't true, do you think that would be a good thing to do?

A.  Uh-uh.

Q.  Why not?

A.  (Witness shrugs shoulders).

Q.  Do you understand that when you are in here today that you have to tell the truth?

A.  Uh-huh.

Q.  You do?

A.  Yes.

Q.  Do you understand that everything you say has to be what really happened?

A.  Yes.

Q.  Okay.  Do you promise the judge, the man sitting here in the robe, do you promise him that you're going to tell the truth and only speak about what really happened?

A.  Uh-huh.

(Ex. B at 23–25).

During a bench conference at trial, the trial judge commented that he did not

place the child under oath prior to her testimony, because he permitted the prosecutor

to lay the foundation as to whether or not the victim was able to tell the truth (Ex. B at 66).[4]

Petitioner has failed to show, by clear and convincing evidence, that Attorney Weekley testified falsely at the evidentiary hearing with respect to whether Ms. Mason ascertained the victim's understanding of her obligation to tell the truth during the recorded forensic interview. Therefore, Petitioner's example of allegedly false testimony by Attorney Weekley does not satisfy his burden of rebutting the presumption of correctness of the state court's credibility finding.

Petitioner also contends Attorney Weekley testified falsely when he stated he did not waive the hearing requirement of Florida Statutes § 90.803(23). Petitioner contends the trial transcript demonstrates Weekley did waive it (*see* ECF No. 17 at 17–18; ECF No. 32 at 18).

Florida Statutes § 90.803(23) provides, in relevant part:

**(23) Hearsay exception; statement of child victim.—**

(a) Unless the source of information or the method or circumstances by which the statement is reported indicates a lack of trustworthiness, an out-of-court statement made by a child victim with a physical, mental,

---

[4] Florida law provides, "In the court's discretion, a child may testify without taking the oath if the court determines the child understands to duty to tell the truth or the duty not to lie." Fla. Stat. § 90.605(2).

emotional, or developmental age of 16 or less describing . . . any offense involving an unlawful sexual act, contact, intrusion, or penetration performed in the presence of, with, by, or on the declarant child, not otherwise admissible, is admissible in evidence in any civil or criminal proceeding if:

1.  The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability.  In making its determination, the court may consider the mental and physical age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, the reliability of the assertion, the reliability of the child victim, and any other factor deemed appropriate; and

2.  The child [ ]:

a.  Testifies; . . . .
. . . .
(c)  The court shall make specific findings of fact, on the record, as to the basis for its ruling under this subsection.

Fla. Stat. § 90.803(23).

The trial transcript demonstrates that prior to the swearing of the jury, the trial court and the parties discussed the admissibility of the child victim's hearsay statements (Ex. B at 4–7).  The prosecutor stated she intended to introduce only the victim's statements during the CPT forensic interview, but on the morning of trial, defense counsel had notified her that he intended to introduce the victim's statements to her mother, Stacy Williams.  The following discussion ensued:

THE COURT:  Yeah, I'm looking at 90.803(23) statement of child victim, and it clearly says that in order for it to be admissible, the court has to have a hearing outside the presence of the jury, that the time, content and circumstances of the statement provide sufficient safeguards of reliability.

We are going to have to have a hearing, but my only concern is how come we didn't do this before we get ready to start the trial?

MR. WEEKLEY:  In a way, Your Honor, we're doing that now, and if I could just clarify a couple of things, what I intend to introduce was originally designed to be impeachment evidence with the mother of the alleged victim.  The statements are taken from information I received in discovery from the State Attorney's Office, in addition to filing a criminal complaint, Ms. Williams also filed for domestic—injunction for prevention of sexual violence.  All of that is part of the Discovery that I received from the state.  There's no transcript or anything.  There's statements in her handwriting.

The position that we're in is that it's vital to the defense of Mr. Savicki to point out the differences in the stories made by the alleged child victim at different points in time.

THE COURT:  Yeah, you can do that, but what you got to do is, you got to ask the child victim, did you say this to this person, did you, say this to this person.  If she admits it, that's it.  If she denies it, then you call that person and ask that person if the child said these things to her.  That's just how you impeach any witness.

MR. WEEKLEY:  And that's what we're planning on doing.  We want to be clear, but in order for us to do that, all of the statements made to the relatives have to come in.  We're prepared to do that through the testimony of the child.

THE COURT:  Well, yeah, that's the standard way you impeach a witness.  First you have to ask the witness about those statements.  You just can't in your own case suddenly throw those statements out there.

MR. WEEKLEY:  Oh, no, no.

THE COURT:  Anything else?

MS. PACE:  Nothing from the state.

THE COURT:  I guess we're going to have to have hearing on your notice to introduce these statements.

MS. PACE:  My understanding from the defense is that he had no problem with them coming in.

THE COURT:  You have no objections?

MR. WEEKLEY:  No objections whatsoever to this. . . .

THE COURT:  Well, then if there's no objection from the defense, then we'll go forward and the state will be allowed to introduce the statements of the victim in their case in chief without conducting a hearing pursuant to 90.803(23) by stipulation of both parties, correct?

MR. WEEKLEY:  Correct, Your Honor.

(Ex. B at 4–8).

Attorney Weekley's testimony at the post-conviction evidentiary hearing was

the following:

Q [by Petitioner].  Okay.  And did you discuss waiving the hearing that is constitutionally mandated by Florida Evidence Code Chapter 90.803(23) with me?

. . . .

THE WITNESS:  We discussed letting the child hearsay in.  We actually had a hearing where I said we were fine with it coming in.  I told the Judge—in fact, I recall looking at this particular part of the video in preparation for this.  I recall telling the Judge that we wanted all of it to come in.

He said we would have to have a hearing.  And I said I think that's kind of what we're doing now.  There wasn't really a waiver of the hearing.

And let me point out that if there was a problem with the Judge not making specific findings on the record related to that particular statute, that would have been an appellate issue.

Q.  (By The Defendant)  And you discussed this with me?

A.  You knew that we wanted the evidence to come in from all of the different statements, yes, sir.

(Ex. I at 67–68).

Although Petitioner argues that Attorney Weekley testified falsely when he stated he did not waive the § 90.803(23) hearing, it is clear from the trial transcript that the issue of the admissibility of the victim's hearsay statements was heard by the court outside the presence of the jury.  Because the defense stipulated to the admission of the victim's statements, the court did not issue a ruling on the admissibility of the statements, nor did the court make findings of fact as to whether the time, content, and circumstances of the statement provided sufficient safeguards of reliability.  The

record does not clearly and convincingly establish that the state court's credibility

finding was unreasonable; therefore, this court defers to the state court's finding that

Attorney Weekley's testimony was credible.

The court will next address the reasonableness of Attorney Weekley's decision

not to challenge the admissibility of the child victim's hearsay statements.  Attorney

Weekley explained his decision as follows:

> Q [by Petitioner].  What was your reason or what evidence did you
> base not objecting to the hearsay rule exceptions under 90.803(23)?
>
> A.  A couple:
>
> First of all, where you have a Child Protection Team interview,
> it's done in such a way that it's typically allowed by the Court.
>
> Especially if, because it meets the first paragraph for reliability.
>
> Especially if, the alleged victim is going to testify in person, which
> she was and she did.
>
> Secondly, the State actually was going to withdraw portions of
> their motion for child hearsay.  We wanted to submit, and we talked
> about this, all the different versions . . . that the mother of the alleged
> victim had put into writing or statement [sic] as child hearsay that had
> come from the child.
>
> In order for us to do that, I wanted everything to come in for as
> many different possible versions. and variations.
>
> Q [by Petitioner].  Without, at the minimum, ensuring that those
> statements still met the constitutionally mandated safeguards or

reliability; that the time, content and circumstances of the hearsay rule exceptions met such—

A.  I was confident that they would because the child hearsay, that was the main part of the hearing, was the CPT interview, also, disclosures that were made to other family members.

. . . .

The theory of defense was:  You can't trust the credibility of the mother; you can't trust the credibility of the alleged victim.  The mother's credibility was absolutely and totally destroyed.

If you've read the trial transcript, you saw Judge Rimmer's comments on the fact that the mother's credibility was pretty much destroyed.  There's no reason to go on and do some additional testimony.

The bottom line is the jury, at the end of the day, didn't believe the child hearsay because it was on a video or because it came through the testimony of another person.  They did not believe, in my opinion, anything that the mother of the alleged victim had to say.  The conviction came back because they believed the testimony, in person, in court, of the little girl.

. . . .

THE COURT.  Mr. Weekley, I think I understood it, but just to make sure the record is clear, I take it there were some inconsistencies between what the child said on the videotape, and the child hearsay and then subsequent statements that she gave?

THE WITNESS:  Minor descriptive terminology.  Some things were omitted from testimony; they were mentioned in the arrest report. Camo shorts, which was part of what Mr. Savicki had disclosed in his letters to earlier counsel.  But the setup, where it occurred, how it occurred, the limitation of what occurred, she was consistent on that.

In between her testimony, the Child Protection Team and her testimony in court, she attended a deposition and refused to answer questions.

At trial, excused [sic] the jury, played the video, we impeached her credibility on the basis that she did not answer those questions, as though it were an inconsistent statement. There were other minor inconsistencies.

The great variation was from the mother in the DVI statements versus what she said to law enforcement, or what she said to law enforcement more matched what the daughter said than what she said in the DVI petitions.

THE COURT. Okay. And would it be fair to say that as a defense attorney, I mean, it is what it is, any you've got to make do [sic] with what you've got to work with.

But any defense attorney would want to bring out the inconsistencies that were present in the child's testimony from statement to statement.

THE WITNESS: Absolutely.

THE COURT: In other words, if the child hearsay did not come in through the State's case—I mean, suppose they never filed a notice of intent to use child hearsay, that would have still been something you wanted—you would have used to impeach the child.

THE WITNESS: Correct.

THE COURT: And it would've come in anyway.

THE WITNESS: Correct.

. . . .

Q [by Petitioner]. And you're—and you're stating on the record that I always agreed to this?

A. Yes. We had several discussion about it.

. . . .

Q.  Who are the sole beneficiaries of the hearsay statements?

A.  There was no sole beneficiary.  We would have benefited [sic] from any discrepancy in the statements, compared one next to the other. And, in fact, you encouraged me time and time again to attack the statements, to attack the interview of the child, to attack the credibility of the mother.  That was the entire thing that you asked me to do.  All these other witnesses, all these other things, debit cards, Yahoo messages, it was to further attack the credibility mainly of the mother.

(Ex. I at 790–795, 797–98).

Petitioner also challenges Attorney Weekley's pre-trial investigation and trial strategy, contending that Weekley failed to investigate any defense theories or pursue a trial strategy.  Petitioner argues:

[C]ounsel's biggest fraud upon the Court is what counsel testified was his defense theory, and it is critical that Petitioner point this out, . . . because the PC [post-conviction] Court's denial of relief is based upon counsel's fraudulent testimony.

(ECF No. 17 at 18).  Petitioner asserts Attorney Weekley "lied" and "fabricated" when he testified that the defense strategy was to attack the credibility of both the victim and her mother, Stacy Williams (*see* ECF No. 17 at 17–21; ECF No. 32 at 16–25, 45–46). Petitioner told the post-conviction court that he wanted Attorney Weekley to pursue the theory that the 5-year-old child victim fabricated the allegation (i.e., that Petitioner placed her hand on his bare penis and moved it back and forth), because the victim's mother, Stacy Williams, pressured the victim to do so.  Petitioner wanted Attorney

Weekley to pursue this theory by presenting evidence that Ms. Williams was a drug addict, and wanted to get Petitioner out of the apartment they shared so that she could steal and sell his used electronics to support her addiction.  Petitioner also wanted Attorney Weekley to show that Ms. Williams was motivated by retaliation for Petitioner's reporting to police, on August 28, 2011, that Mr. James Dean Dickerson kissed the victim on the lips, which caused chid protective services to become involved in Ms. Williams' life.  Petitioner wanted Attorney Weekley to present evidence including (1) testimony from the officer who arrested Ms. Williams for drug possession on April 27, 2012, (2) testimony of people who witnessed Williams' drug use and thefts of other roommates' personal property (including testimony form Tarah Freeman, Raymond Lloyd Tiller, Iesha Rochelle Gooden, and police officers who accompanied Petitioner to the apartment on November 28, 2011, to collect Petitioner's belongings after he was forced to leave on November 24, 2011), (3) testimony from the officers who responded to Petitioner's 911 call regarding James Dean Dickerson, and (4) testimony from witnesses who either never saw Petitioner and the victim at the apartment at the same time, or observed Petitioner's interactions with the victim and saw nothing inappropriate (including testimony from Tarah Freeman, Iesha Rochelle

Gooden, Raymond Lloyd Tiller, Richard Henry Stephens, and James Dean Dickerson).

Petitioner also wanted Attorney Weekley to pursue a second theory, that the child victim may have been the victim of sexual molestation, but it was perpetrated by someone else, for example, Mr. Dickerson or one of the many other roommates in the apartment. Petitioner wanted Attorney Weekley to pursue this theory by presenting evidence including (1) testimony from witnesses who saw several other roommates in the apartment (including testimony from Tarah Freeman), (2) testimony from the officers who responded to Petitioner's 911 call regarding James Dickerson's allegedly kissing the victim, and (3) testimony from witnesses that Mr. Dickerson lived in the apartment after Petitioner made the 911 call (including testimony from Tarah Freeman and Richard Henry Stephens).

Attorney Weekley testified as follows with respect to the trial strategy:

> There were two alternatives that we discussed: You had raised several times concerns about a person by the name of James, who had been found kissing the alleged victim in your case. I think the phrase that you repeated was: "Like a man kisses a woman". That you had called 911. You wanted to shift the blame to him and say that he was the one who had done these things. We elected not to do that because the allegations against the James person were different than the allegations against you.

For example, the allegations against James occurred in a common living area with several children present in front of a television while the child slept.  The allegations against you were isolated to your room and [the victim] only.

The alleged victim, [ ], elected not to say anything at all at her deposition.  I made you aware of the fact that there were some concerns about the cooperation from the mother of the alleged victim and the alleged victim, herself; and that it was a cleaner way and a better way to attack the credibility, as you asked me to attack the credibility of the mother of the alleged victim, and to stand by your assertion that you had made across the board, that these things had not happened and you were not guilty.

. . . .

That was our theory of defense, in part, that the mother lied; that the daughter was not trustworthy because she had refused to testify at the deposition.  I certainly did not go into the case arguing for the veracity of what she said.

. . . .

Q [by Petitioner].  So you're stating on the record, Mr. Weekley, that I agreed with your theory of defense, to attack the credibility of the allegations that were made against me?

A.  Yes.

Q.  And you based that theory of defense upon what?

A.  I based that theory of defense upon the best possible way to proceed with what we had to work with.

Q.  On what evidence?

A.  On the evidence of the fact that the child and the mother were at times uncooperative with the State, which would go against their credibility; based upon the child showing up at the deposition and refusing to answer any questions directly to either the State or the

> defense, going against her credibility; against the varying statements that
> were made by the mother of the alleged victim that were each different
> from the other, going against the credibility that she had, and there was
> much more that went against her credibility, by her own admissions, at
> the trial.  That was the theory of defense.

(Ex. I at 756–57, 768–69).

With respect to pre-trial investigation, Attorney Weekley testified he reviewed

the notes from the depositions taken by Petitioner's first trial counsel, Attorney

Russell (Ex. I at 763).  Attorney Weekley testified he also reviewed the notes from the

depositions of Stacy Williams (the victim's mother), Michelle Zebracki (the victim's

"aunt"), and the two depositions of Jerry Weekley (the victim's uncle), and he

reviewed the videos of the victim's CPT forensic interview and the victim's

deposition (*id.*).

Attorney Weekley testified he was aware of the information in the police report

from November 28, 2011, which indicated that some items of Petitioner's personal

property were located in Stacy Williams' locked bedroom, and Weekley was aware

of the evidence that Ms. Williams was a drug addict, specifically, that she was arrested

for drug possession prior to Petitioner's trial (Ex. I at 774–75).  Attorney Weekley

testified:

> If I recall the items, there were a couple of gaming systems and a
> television.  I would not have felt comfortable pursuing that as a theory

> of defense, for a jury, to say that she is enticing her daughter to make accusations against you, and putting her through the stress of a trial to testify against you for a couple of used gaming systems and other electronics.

(Ex. I at 774). With respect to evidence of Ms. Williams' drug use, Attorney Weekley testified he did not spend time investigating whether she was a drug addict, but Ms. Williams freely admitted she was a drug addict at trial (*id.*).

Attorney Weekley testified he made the decision not to contact Tarah Freeman, Iesha Rochelle Gooden, Raymond Lloyd Tiller, Richard Henry Stephens, or James Dean Dickerson "based on what [Petitioner] had to say about them, both what they would say, their characteristics, their attitudes toward you." (Ex. I at 787). Specifically with respect to each witness, Attorney Weekley testified as follows:

> Q [by Petitioner]. So Tarah C. Freeman—
>
> A [by Attorney Weekley]. Uh-huh.
>
> Q. —made you aware that she had warned me weeks prior to the allegations to watch my back because Stacey Williams was going to set me up?
>
> A. That is not what you told me. You wrote to me in several letters in fact, you provided, not only to myself, but also to Mr. Russell, a list of questions to ask Ms. Freeman at deposition. None of those questions related to your being set up.
>
> You consistently said for the first few months of your correspondence that Tarah Freeman had told you a few weeks before the

mother of the alleged victim reported the alleged abuse to law enforcement, that you had been molesting her daughter, to use your phrase.  You did say consistently that she told you to watch your back.

In evaluating whether that testimony would have been helpful at trial, I also took into account that you told me that Ms. Freeman had been kicked out of the house by the mother of the alleged victim.

And in reviewing the Department of Children and Families' report related to the mother of the alleged victim, that she had told Department of Children and Families that she had kicked several people out of the house for drug use.

I also took into account your characterization of her, that she was part of the group that you referred to as drug addicts.

Her testimony about the mother having told her about the allegations earlier in time than were reported to law enforcement would probably only have served to impeach the credibility of the mother, to show that she wasn't a good mother for not having made law enforcement aware of those allegations earlier.

Also, if we had called Ms. Freeman, she could have been impeached by Ms. Williams, the mother of the alleged victim, on rebuttal evidence by the State, that she was motivated to get revenge for Ms. Williams having kicked her out of the house.

You also say, in your 3.850, that Ms. [Freeman] was available. But in your correspondence to me, you asked me to go to her and, to inform her of how long you had been in jail; what the penalty was that you were facing for the allegations made against you; to act as though I had copies of text messages between you and her that was her warning you to watch your back; and that I had to do that or else she might not cooperate.

. . . .

Q. But I did tell you that Tarah C. Freeman did warn me to watch my back?

A.  That is correct.

And here's my point, Mr. Savicki, your first few months of correspondence, the phrase consistently came up that you had been warned to watch your back.

No mention of:  She had set me up.

At some point into the correspondence, you began to say, well, maybe this is the reason the mother has made the allegations against me, is that she was setting me up.

And then as soon as the trial is over, your correspondence to Regional Conflict Counsel, the people that follow me, is that she was going to testify that I had been set up.  That is not what you told me.

Q.  So I never wrote you that?

A.  You wrote me that she told you to watch your back, but you never wrote me that she was going to come forward and say that she knew, based upon statements made by the mother, that all of the allegations against you were made up.
. . . .

Q.  Did I not also inform you that Tarah was there on one evening when, the one or two times that I recall that [the victim] was there at the same time, and that Tarah would testify that she did not observe any odd reactions to my presence from [the victim]?

A.  There was an ethical reason for which I would not have been able to call her to testify to that.
. . . .

[Y]ou had also disclosed to me and to Mr. Russell prior to me, that there was an event that you referred to as an innocent event, where the

alleged victim came into your bedroom and snatched the covers off of you while you were wearing camouflage shorts.  You refer to that about six times in your correspondence.

Many of the witnesses that you complain that I didn't investigate and call, you wanted me to ask of them:  Isn't it true that they were never around each other; that there wasn't an opportunity for them to do that?

I don't ethically—because of my candor responsibility to the Court, I can't put you on the stand and ask that.  And I think it's thin ethical grounds for me to try to get that sort of a denial in through a third-party witness, when I know that to not be true based upon what you've told me.

(Ex. I at 778–83).

With regard to Iesha Rochelle Gooden, Attorney Weekley testified that Petitioner informed him that Ms. Gooden was the girlfriend of Raymond Tiller, and that Tiller had told another person that Petitioner admitted to him (Tiller) that he had engaged in the sexual molestation of which he was accused (Ex. I at 784).  Attorney Weekley continued:

I didn't have any interest in trying to find a witness that could lead the State to someone who would make an allegation, whether true or not, that you had made an admission.  Because one of the strengths of our case was that you had consistently denied that you had done it.

To try to track somebody down that might lead the State to a person who would make that allegation against you, possibly, was not in your best interest.

Further, you warned me that one of the ways that I could find her was to go through Mr. Tiller, who for a while was housed with you at the Santa Rosa County Jail.

But I think the phrase that you used, to be specific and refresh my recollection, that: He would be a reluctant hostile witness.  If Ray thinks it will help me, he may not help.  Take caution.  He told a friend of mine that I admitted to doing it.  So anybody connected with Mr. Tiller is not a witness that I'm interested in calling.

Plus, what she would testify to about you and the mother disagreeing over your calling DCF or having arguments about that, DCF was called on her, by your letters and by the reports that I read, by people other than yourself.

Q [by Petitioner].  That is correct.

A.  Okay.  So I don't know that there's a great evidentiary value in finding motivation that she doesn't want DCF being called on her, when DCF is constantly being called on her, according to what we reviewed.

. . . .

Q.  Okay.  Fair enough.

And the same stuff with Raymond Lloyd Tiller—

A.  And again, I refer back to my answer on Ms. Gooden.  I do not think am doing you any favors to look for anyone who you tell me has told another person you said you did it; or who you tell me, I've got to use caution or my investigator has to use caution because they're going to be a hostile witness; if they know it's for me, they're not going to help.  Why am I going to track these people down?  Because if they become aware that you have a case, they become aware that we're investigating the case and we might involve them—let's assume for a moment that they say the few small things that might further impeach the credibility of the mother of the alleged victim, why would we open the

door to the possibility that the State may elicit from them alleged admissions that you made about what you're charged with?  That has no logic.

Q. How about conversely, maybe they verify everything that I say and other evidence that I don't even know anything about.  All I can tell you in my letters to you—

A.  I don't do my investigations based on speculation.  I made my decisions to talk to or not talk to witnesses based upon what you told me in your correspondence.
. . . .
And hold on for one second.  Let me clarify.  Based upon what you told both Mr. Russell and myself, because some of the information I'm referring to was disclosed to Mr. Russell and Ms. Edwards from the Public Defender's Office prior to them conflicting off of the case.  So with the benefit of the full file and your statements in your correspondence to all the attorneys, including myself, that was why I made my decisions.

Q.  But referring back to Tarah Freeman, I made you aware of text messages between her and myself on the night that Stacey Williams called law enforcement on me?

A.  You mentioned text messages.

Q.  And that the substance of those text messages would have been from myself to her:  You won't believe what Stacey just did.

From her to me:  I tried to warn you, did I not?

From me back to her:  I need you to fill out a statement.

And she said that she would and asked me:  What do you want me to say?

And I specifically said:  The truth, please.  Oh, God.  Do not lie. Just tell the truth.

A.  I never had the benefit of any text messages.  I know what you wrote.  There were several times that you would recount in detail each party's side of the conversation through messenger, Facebook, texts. The bottom line on what you told me about Ms. Freeman was that she made a report to you earlier than the mother reported to law enforcement of allegations against you.

You never told me that she would come forward and say:  The mother said, I'm going to set him up.

You drew a conclusion in later letters that that is what was going on and that her telling you that the mother of the alleged victim had said that you were doing this to her daughter, and watch your back, must have been a sign from her.  You speculate that she knows more.  You never said:  This is what she told me.

But there were other people in the case, as well, that you said heard about the allegations days or weeks before, that they were reported to law enforcement.  Calling Tarah Freeman—

. . . .

Calling Tarah Freeman would not have helped your case.  It was not a silver bullet or a smoking gun without some other admission from the mother of the alleged victim, which never came.

. . . .

Q.  Did I not inform you that Richard Henry Stevens would testify that James Dickerson was allowed to move into a bedroom upstairs?

A.  You told me that.

And you also told me that he was the boyfriend of the alleged victim's mother and that he was a sex offender who was not suppose [sic], to be living at that address.

Q.  That is correct.

A.  So what value—I'm sorry.  Go ahead.

Q.    And that Richard Henry Stevens, as well as the other roommates, would testify that I had threatened to call DCF on Stacey?

A.  I do not believe that Mr. Stevens would have been willing to testify on your behalf about that matter because it would have required him to admit that he was at a location he was not supposed to be at.

Q.  And when did you come up with that assertion?

A.   When I read your letter informing me that he was a sex offender who was not supposed to be living at that address.

Q.  Okay.

(Ex. I at 784–90).

With regard to James Dean Dickerson, Attorney Weekley explained:

I'll tell you the problem with talking about James is she [the victim] never mentioned another name.  If there had been:  I'm not sure who did it, it was a guy who lived with my mom, or stayed with my mom, or it was a guy whose name started with "J", and perhaps it was James instead of Joseph; if the allegation had been that you had caught them in your room; if the allegation had been that that happened [i.e., James' kissing the victim] when she was alone and not surrounded by other people, with him; if there was some other similarity other than the fact that there was a person who was inappropriate with the child, not as inappropriate as what you were alleged to have done, but some inappropriate action with an adult male, that wasn't enough to run with, in my opinion.

(Ex. I at 795).

Although Attorney Weekley's strategy did not yield the outcome that he and Petitioner desired, it was nevertheless a reasonable one to pursue, and thus counsel was not ineffective.  There was strong evidence supporting the defense theory that Ms. Williams fabricated the allegation, and that the victim's testimony was untrustworthy. Attorney Weekley pursued this theory by presenting evidence that Ms. Williams was a perpetual liar.  Attorney Weekley impeached Ms. Williams with factual conflicts in the statements she provided to police, to the courts in a separate civil matter, and in her trial testimony, and Attorney Weekley even elicited Ms. Williams' admissions at trial that she was a drug addict and had provided false sworn statements to the police and to the court (in a separate civil proceeding) regarding the molestation allegation against Petitioner.

Additionally, Attorney Weekley impeached the victim's trustworthiness by eliciting her testimony that after her initial statements during the CPT interview, she (1) could not describe what "Joe" looked like, (2) did not know what color "Joe's" hair was, (3) could not say what a "private part" was, and (4) could not say whether anything had happened to her (Ex. B at 36–37, 59, 62–64).  Attorney Weekley also elicited the victim's testimony that she did not tell her "aunt," Michelle Zebracki, or her uncle, Jerry Weekley, about the sexual molestation (Ex. B at 37), which conflicted

with the testimony of Michelle Zebracki and Jerry Weekley that the victim told both of them about it (Ex. B at 153–56, Ex. C at 188). Attorney Weekley additionally elicited the victim's testimony that she did not remember being in a room with a woman named Leilani and coloring with her (i.e., referring to the CPT forensic interview) (Ex. B at 37–38), and then Leilani Mason testified that she interviewed the victim, and a videotape of the interview was published to the jury, during which the victim was clearly coloring (*id.* at 71, 74–95).

Attorney Weekley also impeached the victim's credibility through his cross-examination of CPT Case Coordinator Leilani Mason. Attorney Weekley elicited Ms. Mason's testimony that the victim told her that "Joe" touched her four times, but when Ms. Mason asked the victim about multiple times, the victim responded that she did not know about the other times (Ex. B at 98–99). Attorney Weekley also presented evidence, through the victim's statements during her forensic interview, that her mother, Ms. Williams, was mad at Petitioner, thereby suggesting a motive for Ms. Williams to make a false molestation report to police.

Presenting evidence of the weaker theory (i.e., that the victim may have been molested, but someone else did it) would have diluted the strength of the theory that the victim was fabricating. Additionally, as pointed out by the state post-conviction

court, there were numerous problems with investigating and presenting the evidence

that Petitioner wanted Attorney Weekley to present, including admissibility issues,

credibility issues, and the fact that some of the evidence was a "double-edged sword"

that likely would have been more harmful than helpful to the defense.

As the Eleventh Circuit stated in Dill v. Allen:

> In light of the reasonableness standard set forth by the Strickland Court, our circuit maintains that constitutionally sufficient assistance of counsel does not require presenting an alternative—not to mention unavailing or inconsistent—theory of the case. *See Johnson v. Alabama*, 256 F.3d 1156, 1178 (11th Cir. 2001) (finding no ineffective assistance of counsel where a petitioner's "now-preferred 'third man' defense" was "not compatible" with the information he conveyed to trial counsel when formulating strategy pre-trial); Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000) (finding no ineffective assistance of counsel where a reasonable attorney could have deemed an alternative theory "inconsistent with Petitioner's own description of the killing"). That is, we will not find ineffective assistance of counsel simply because a petitioner's counsel failed to chronicle every possible theory of the relevant facts. *See Chandler*, 218 F.3d at 1318 (en banc) ("[C]ounsel's reliance on particular lines of defense to the exclusion of others—whether or not he investigated those other defenses—is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable."). Reasonableness, indeed, suggests that a trial counsel would weigh competing theories and choose to present the most compelling theory among the various options. *Id.* at 1315 n. 16. Petitioner's constitutional right to effective assistance of counsel did not require counsel to channel Scheherazade in recounting myriad possible theories.

488 F.3d 1344, 1357 (11th Cir. 2007).

Here, the state court reasonably determined that Attorney Weekley made a reasonable strategic decision to focus on one trial strategy.  The court also reasonably concluded that reasonable professional judgments supported Attorney Weekley's decisions to limit his investigation of Petitioner's suggested witnesses, and to allow admission of the victim's hearsay statements.  It is possible that fairminded jurists could disagree as to the reasonableness of Attorney Weekley's decisions; however, this potential for disagreement precludes this federal court from granting habeas relief on this claim.  *See* Harrington, 562 U.S. at 786 ("A state court's determination that a claim lacks merit precludes habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."); *id.* (§ 2254(d) preserves the federal court's authority to issue the writ in cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents); *see also* Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257 (11th Cir. 2101) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."); Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1127 (11th Cir. 2012) (if, at a minimum, fairminded jurists could disagree about the correctness of the state court's decision, the state court's application of Supreme Court precedent was not

unreasonable, and AEDPA precludes the grant of habeas relief) (citing <u>Harrington</u>, supra); <u>Johnson v. Sec'y, Dep't of Corr.</u>, 643 F.3d 907, 910 (11th Cir. 2011) (". . . only 'if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents' may relief be granted.") (quoting <u>Harrington</u>, *supra*).

With respect to <u>Strickland</u>'s prejudice prong, the state court reasonably concluded that Petitioner failed to show a reasonable probability that the outcome of trial would have been different if Attorney Weekley had challenged the admissibility of the victim's hearsay statements, and investigated and presented the evidence that Petitioner faults him for not pursuing (i.e., testimony from Tarah Freeman, Iesha Rochelle Gooden, Raymond Lloyd Tiller, Richard Henry Stephens, James Dean Dickerson, and the police officers who responded to the apartment in August and November of 2011). *See* <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1328–33 (11th Cir. 2013) (holding that it is reasonable for a state court to conclude that a petitioner fails to establish prejudice when the evidence that defense counsel failed to introduce was a "double-edged sword" that likely would have been more harmful than helpful) (citations omitted).

As a final matter, the undersigned rejects Petitioner's argument that the state court failed to provide him an opportunity to develop and present the factual basis for his claims. Nothing in the record suggests that the state court did not give appropriate consideration and weight to Petitioner's proffer of the evidence he faulted Attorney Weekley for not presenting at trial. Petitioner proffered the essence of this evidence in his second amended Rule 3.850 motion, in the numerous attachments to the motion, and during the evidentiary hearing (in both his questions posed to Attorney Weekley and in his direct exchanges with the court) (*see* Ex. H at 455–600, Ex. I at 601–05, 685–98, 730–800, Ex. J at 801–30). At the beginning of the evidentiary hearing, the state court told Petitioner, "I want to hear you proffer what these witnesses would have said and how it's relevant to what you're convicted of." (Ex. I at 742). The court advised Petitioner that if it appeared that his proffer was sufficient to warrant further factual development, the court would bifurcate the hearing and provide Petitioner an additional opportunity to present evidence (*id.*). After Attorney Weekley testified, the court provided Petitioner the opportunity to present all of the evidence available to him, and to proffer what any other witnesses or evidence would show (Ex. J at 809). The court reiterated that it would consider the trial transcript and all of Petitioner's submissions (*id.* at 813–28). With respect to additional witnesses, the court ruled:

THE COURT:   [B]ased on what I've heard, I don't think it's necessary to call the other witnesses, I don't think there's any value to it.  I think defense counsel clearly made his trial strategy not to call the witnesses, not to contact them for the reasons he stated.

Mr. Weekley is an excellent attorney.  He's been doing this a long time.  He shows very good judgment in the cases that he's tried with me and other court proceedings.  And his explanations on the stand today, as to why he didn't contact or call the witnesses that you allege he should have called, I don't think it's necessary for me to hear from those witnesses.

A lot of the statements you are attributing to those witnesses would have been inadmissible at a trial.  Just a blanket, vague statement by somebody, quote:  He set me up, or she set me up, or I think she's trying to set you up, or I told you, that, by itself, is not admissible in court.   And for the strategy reasons he discussed, I don't think it's necessary for me to hear other witnesses.
. . . .
I mean, especially the ones that attribute an admission by the defendant.

The last thing you're going to do as a defense counsel is contact somebody who may open the door to that and give the State access to information that they don't already possess that's incriminating to your client.  That not only is a good strategy decision not to follow up on that, I think it would've been malpractice to have done anything differently.

As far as witnesses who might have testified that this was not first reported to law enforcement, you're opening up the door to getting evidence in front of a jury that the child and/or the mother accused the defendant of this and made statements to other people that it happened. What little value you might get out of a delay in reporting would be more than off set by allowing the State access to incriminating information against your client that there had been other accusation— that it—it would buttress the reporting.  You know, the more times a victim reports

something to somebody, the more believable it becomes. As a matter of fact, that's why there's a rule against it. You can't get a witness on the stand and say—in most cases, there are exceptions to this. Generally, you can't buttress the testimony of your witness by talking about out-of-court statements made by that same witness.

What Defendant is suggesting his attorney should have done is ignore these rules, ignore the fact that even the State is not trying to get that in evidence and go ahead and put it on yourself. I think that would be crazy.

I won't comment on all the testimony and all the witnesses. I'll do that more in detail in a written order as to why I think it was sound strategy not to call and investigate the witnesses. But I don't think it's necessary for me to hear from the witnesses based on what's been proffered to me.

(Ex. J at 810–13).

Additionally, to the extent Petitioner argues the state court's adjudication of the merits is not entitled to deference because the state court denied his request to transcribe the pre-trial depositions of Stacy Williams, Michelle Zebracki, and Jerry Weekley, and include the transcripts in the post-conviction record (*see* Ex. I at 711–13, Ex. J at 900–01) his argument is unavailing. At the state court evidentiary hearing, Petitioner questioned Weekley about why he did not obtain the transcripts. Attorney Weekley responded:

THE WITNESS: With the exception of the alleged victim, who we had on video, the mother of the alleged victim, whose deposition I did, Leilani Mason, who filed the CPT report and the video, I thought

> that Jerry Weekley and Michelle Zebracki were more helpful to us than otherwise.
>
> If I'm going to get a transcript of somebody's deposition, it's so that I can catch them to impeach them. I don't typically prepare to impeach witnesses that I think might actually be helpful. I didn't need to get the transcript of the mother's testimony at deposition because we had so much in her handwriting and so much other statements that she made to law enforcement. I didn't need the transcript of the deposition of the alleged victim because she really didn't say anything on video. I didn't need the transcript of Leilani Mason because I had a detailed report that CPT investigators always refer to, very seldom vary from, and a video of what she did when she was talking to the alleged victim. I had what I needed for trial.

(Ex. I at 799–800).

Petitioner did not proffer to the state court how the transcripts of the pre-trial depositions would have provided factual support for his claims that Attorney Weekley was ineffective for failing to conduct pre-trial investigation, failing to challenge admission of the victim's hearsay statements, or failing to present certain witnesses at trial; nor did Petitioner proffer how the how the transcripts would have provided factual support for his showing of prejudice.[5]    Therefore, the state court's

---

[5] The pre-trial depositions are the subject of Petitioner's pending requests that this federal court assist him in obtaining the transcripts (ECF Nos. 35, 36). Petitioner states that on May 19, 2018, he spoke with Jerry Weekley. Jerry Weekley is the victim's uncle and was called as a defense witness at trial. Petitioner alleges Jerry Weekley told him the content of his pre-trial deposition. Petitioner alleges Jerry Weekley told him that at the deposition, Weekley informed Petitioner's trial counsel that he was told, by his aunt, that the two of them (Jerry Weekley and Attorney Timothy Weekley) were related. The state court's failure to grant Petitioner's request for the deposition transcript did not prevent Petitioner from discovering this fact. The trial transcript shows that this

failure to grant Petitioner's request did not render the court's adjudication of the IATC

---

information (i.e., that Jerry Weekley's aunt told him that he and trial counsel were related, but that neither counsel nor Jerry Weekley knew if that was true, and the two did not know each other) was brought out at trial (Ex. C at 187–88).

Petitioner also alleges Jerry Weekley told him that he told Attorney Weekley that after Petitioner left Ms. Williams' apartment in November of 2011, Mr. Dennis Thurman moved in; but then Ms. Williams kicked him out and stole his belongings, just as she did to Petitioner. Petitioner alleges this provides more support for his claim that Attorney Weekley was ineffective for failing to present evidence that Ms. Williams fabricated the allegation for financial gain. Even if this information was part of the state court record, it would not demonstrate that the state court's rejection of Grounds Six or Seven was unreasonable. The court reasonably concluded that the monetary gain theory (i.e., that Ms. Williams was motivated to falsely accuse Petitioner because she wanted to steal and sell his used electronics to support her drug habit) would not have been an effective means of impeaching Ms. Williams, and that her numerous inconsistent statements was a much stronger means of impeachment.

Petitioner additionally alleges Jerry Weekley told him that he told Attorney Weekley that Ms. Williams (the victim's mother) had made "new allegations" against him (Jerry Weekley), but that a protective services investigator told him that the allegations were not pursued because the investigator "kept catching Ms. Williams lying." In Petitioner's case, defense counsel destroyed Ms. Williams' credibility at trial by eliciting her admission that she had previously provided false information in a sworn written statement to police and in three sworn written statements to the court (in a different civil proceeding) (*see* Ex. B at 116–17, 119-25, 135–42). Furthermore, evidence that Ms. Williams had accused others of sexually abusing the victim had no bearing on the credibility of the victim's testimony and thus would not have been admissible to impeach the victim. *Cf.* Sec'y, Fla. Dep't of Corr. v. Baker, 406 F. App'x 416, 424–25 (11th Cir. 2010) (evidence that the same victim accused others of sexual abuse may be used to cross-examine a witness about false allegations of sexual abuse).

With respect to Michelle Zebracki's deposition, Petitioner did not proffer, either in state court or this federal court, what a transcript of her pre-trial deposition would show, let alone that it would support any of his IATC claims. Petitioner submitted to this court "Facebook messenger responses" obtained by Petitioner's mother and allegedly posted by Ms. Zebracki (*see* ECF No. 35). In these Facebook messages, all of the information that Ms. Zebracki states she provided to Petitioner's trial counsel related to Stacy Williams' (the victim's mother) lying. As previously discussed, Attorney Weekley elicited Ms. Williams' admission at trial that her testimony contradicted her sworn written statements provided to police and the courts. Therefore, Petitioner has not shown that the state court's denial of Petitioner's request for the deposition transcripts rendered the state court's adjudication of his IATC claims contrary to or an unreasonable application of clearly established federal law.

claims contrary to or an unreasonable application of clearly established federal law.

C.    <u>Ground Three:  "IOC [sic]—failure to challenge the competency of the alleged victim to testify and seek a psychological expert's opinion."</u>

Petitioner claims that Attorney Weekley was ineffective for failing to challenge the competency of the child victim to testify (ECF No. 17 at 22–25; ECF No. 32 at 27–33).  Petitioner also faults counsel for failing to engage the services of a psychological expert to determine whether the victim was competent to testify and whether the victim was coached and manipulated by her mother (*id.*).

Respondent concedes Petitioner exhausted this IATC claim (ECF No. 27 at 19–20).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 20–22).

1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner presented this claim as Claim #2 of his second amended Rule 3.850 motion (Ex. H at 459–60).  The state circuit court adjudicated the claim as follows:

**<u>Claim Two—Failing to Object to Court's Lack of Finding Child Victim Competent</u>**

Defendant next alleges that counsel was ineffective for failing to challenge the child victim's competency.  Defendant also alleges counsel was ineffective for failing to object to the Court not making a finding that the child victim was competent to testify as required by section 90.605(2), Florida Statutes.  Defendant claims the child victim did not demonstrate she understood a "moral obligation to tell the truth and the duty not to lie."  Defendant further alleges that counsel could have challenged the child victim's competency by using existing case precedent and consulting with a psychological expert to determine whether the child victim was competent to testify.  Defendant also contends that since counsel "having nothing to lose and everything to gain by objecting" could have objected and prevented the State from proving the offense as the child victim was the only alleged eye witness.  Defendant alleges that without the child victim's testimony, the jury could not have found Defendant guilty.

Initially, it appears this claim might be facially insufficient as Defendant fails to allege there is a reasonable probability that the results of Defendant's trial would have been different if counsel had challenged the child victim's testimony or objected to the Court's failure to make a finding regarding the child victim's competency.  Defendant basically alleges that counsel had "nothing to lose" in objecting to the child victim's competency which is not an allegation that lends itself to finding it is "reasonably probable" a different result would have occurred.

Even if this claim were not facially insufficient, the record refutes Defendant's claim.  Contrary to Defendant's allegations, the Court *did* in fact find that the child victim was competent to testify.[FN 21] Additionally, even though this claim was not set for evidentiary hearing, counsel testified in response to Defendant's questions at [the] evidentiary hearing that he did not believe the child victim was incompetent.  The Court finds that the record supports counsel's opinion that the child victim was competent to testify.[FN 22]  Consequently, the Court finds there was no valid basis for counsel to object to the child victim's testimony.  The Court further finds that if counsel had objected, the

> Court would have overruled the objection and the child victim would
> have been permitted to testify.  As the Court made the finding that the
> child victim was competent to testify, and because the record shows the
> child victim was competent,[FN 23] Defendant has failed to demonstrate
> that counsel was deficient or that Defendant was prejudiced.  Defendant
> is not entitled to relief as to this claim.

(Ex. J at 908–09) (footnotes citing to trial transcript and evidentiary hearing transcript

omitted).  The First DCA affirmed the decision without written opinion (Ex. U).

Although an ineffective assistance of counsel claim is a federal constitutional

claim which the court considers in light of the clearly established law of Strickland,

when "the validity of the claim that [counsel] failed to assert is clearly a question of

state law, . . . we must defer to the state's construction of its own law."  Alvord v.

Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984) (explaining, in the context of an

ineffective assistance of appellate counsel claim, that "[o]n the one hand, the issue of

ineffective assistance—even when based on the failure of counsel to raise a state law

claim—is one of constitutional dimension," but, "[o]n the other hand, the validity of

the claim [counsel] failed to assert is clearly a question of state law, and we must defer

to the state's construction of its own law.") (citations omitted)[6]; *see also* Callahan v.

Campbell, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot

---

[6] Alvord was superseded by statute on other grounds as noted in Hargrove v. Solomon, 227
F. App'x 806 (11th Cir. 2007).

be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); Herring v. Sec 'y Dep't of Corr., 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (quoting Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997)).

A witness's competency to testify is a matter of state law. *See* Fla. Stat. §§ 90.602, 90.603. Here, as in Alvord, Callahan, and Herring, the state court has

already answered the question of whether counsel had a meritorious basis to object to the child victim's competency to testify—counsel did not.  This court must defer to the state court's determination of state law.  The failure by Petitioner's counsel to raise this issue cannot be deemed deficient performance, and Petitioner cannot show he was prejudiced by counsel's failure to raise this issue, because it had no arguable basis for success.  Therefore, Petitioner is not entitled to relief on this aspect of his IATC claim.

With respect to counsel's failure to engage the services of a psychological expert to determine if the victim was competent to testify, and whether the victim was coached and manipulated by her mother, Petitioner's assertions as to what an expert would have concluded, if an expert had examined the child, are purely speculative. Petitioner's unsupported speculation is insufficient to show that counsel's failure to secure the services of an expert was deficient.  Petitioner's speculation is also insufficient to show that there is a reasonable probability the expert would have opined that the victim was not competent to testify, or that the victim's allegation was the product of coaching or manipulation.

Petitioner failed to demonstrate that the state court's adjudication of this IATC claim was based upon an unreasonable determination of the facts, or that it was

contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is entitled to

federal habeas relief on Ground Three.

      D.    <u>Ground Four:  "IOC [sic]—failure to challenge tainted, unreliable in-</u>
<u>court identification where prosecutor pointed to Petitioner."</u>

Petitioner alleges prior to trial, the victim did not visually identify the

perpetrator, and instead identified the perpetrator only by the name "Joe" (ECF No.

at 17 at 27–33; ECF No. 32 at 33–37).  Petitioner alleges the victim could not

physically describe "Joe" during her deposition other than that he was white, and the

victim could not state when she last saw "Joe" (*id.*).  Petitioner alleges law

enforcement relied upon the victim's mother (Stacy Williams) to identify "Joe," but

Ms. Williams had a motive to falsely accuse Petitioner (i.e., she wanted to steal and

sell Petitioner's used electronics to support her drug habit) (*id.*).  Petitioner alleges

during the child victim's trial testimony, the prosecutor pointed to Petitioner and

asked if the victim knew "who the man is over in the red shirt," and the victim

responded, "Joe"; however, when the victim was asked if she knew "Joe," had ever

seen "Joe" before, and several other questions, the victim answered in the negative

(*id.*).  Petitioner alleges at no time was he identified as the perpetrator (*id.*).  Petitioner

also alleges James Dean Dickerson may have molested the victim, because Dickerson

was caught kissing the victim (*id.*).  Petitioner contends Attorney Weekley was

ineffective for failing to object to the in-court identification as "tainted" (*id.*).

Petitioner contends that if counsel had objected, "the jury could have rendered a

different verdict because of a reasonable doubt as to identity" (*id.* at 33).

Respondent concedes Petitioner exhausted this IATC claim (ECF No. 27 at

22–23).  Respondent contends the state court's adjudication of the claim was not

contrary to or an unreasonable application of clearly established federal law (*id.* at

23–26).

      1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

      2.    Federal Review of State Court Decision

Petitioner presented this claim as Claim #3 of his second amended Rule 3.850

motion (Ex. H at 460–61).  The state circuit court adjudicated the claim as follows:

**<u>Claim Three—Failing to Object and Move to Suppress In-Court
Identification</u>**

Defendant next alleges that counsel failed to object and move to
suppress the in-court identification.  Defendant alleges that "counsel
made several issues about identification."  Defendant further contends
that neither Michelle Zebracki nor Jerry Weekley (witnesses at trial)
knew Defendant; therefore they would not be able to testify whether
Defendant was the "Joe" in the allegation.  Defendant further states that
his appearance had changed since the time of the incident:  he had lost
weight, shaved off his goatee and mustache, and allowed his hair to grow
out where he had been bald previously.  Defendant also claims that

counsel should have objected to the State pointing to Defendant, describing the color of his shirt and then asking the child victim to identify Defendant. Defendant claims that if counsel had succeeded in suppressing the identification, it would have raised reasonable doubt as to Defendant's identity as the perpetrator, and the jury would have found Defendant not guilty.

Defendant has failed to allege a valid basis for counsel to have objected or moved to suppress the in-court identification of Defendant as the perpetrator of the crime. Initially, the Court notes that neither Michelle Zebracki[FN 24] nor Jerry Weekley[FN 25] was asked to identify Defendant in-court, most likely for the reason cited by Defendant: neither Michelle Zebracki nor Jerry Weekley knew Defendant. Defendant admits his appearance was drastically different at the time of trial but the child victim was still able to identify Defendant by name.[FN 26] The record shows that the State asked the child victim "Do you know who the man is over in the red shirt over there?" to which the child victim responded "Joe."[FN 27] Upon further questioning, the child victim testified that Joe had grabbed her hand and put it on his penis, moving her hand back and forth.[FN 28] Considering the age of the child victim, the State's question directing the child victim to the man in the red shirt was wholly appropriate. The State did not include in its vague description of Defendant's clothing any indication that Defendant was the person who had committed the crime against the child. It was the child victim who testified later that it was Joe, who used to live in her mother's house, who had molested her. The Court finds that if counsel had objected to the State's question to the child victim, it is likely the objection would have been overruled.

Even though this claim was not scheduled for [the] evidentiary hearing, counsel testified in response to Defendant's questions that the child victim never identified Defendant from a pretrial photo line-up, "[b]ut I think she knew who she was talking about when she said, Joe, who lives with my mom. There was not another Joe that you ever made me aware of that lived in that house."[FN 29] Counsel also testified that the identity of the alleged perpetrator was never a question in this

case.[FN 30]  "This is not an identity case.  There were several months when both the mother, the alleged victim—and Mr. Savicki agreed they lived in the same house."[FN 31]  The Court finds counsel's testimony credible. Defendant has failed to show that counsel had a valid basis to object or move for suppression of the in-court identification. Consequently, Defendant has failed to show that counsel was deficient or that he was prejudiced.  Defendant is not entitled to relief as to this claim.

(Ex. J at 909–12) (footnotes citing to trial transcript and evidentiary hearing transcript omitted).  The First DCA affirmed the decision without written opinion (Ex. U).

In Perry v. New Hampshire, 565 U.S. 228, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012), the Supreme Court reiterated the holdings of its previous precedents with respect to the approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement.  The Court emphasized, first, "that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.  Id., 565 U.S. at 238–39 (citing Manson v. Brathwaite, 432 U.S. 98, 107, 108, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), and Neil v. Biggers, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 410 (1972)).  Second, "[e]ven when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence."  Perry, 565 U.S. at 239 (citing Brathwaite, 432 U.S. at 112–113 and Biggers, 409 U.S. at 198–199).

The _Perry_ Court rejected the argument that its precedents should be read more broadly to require a trial court to screen <u>all</u> identification evidence for reliability before allowing the jury to assess its creditworthiness, including identification evidence that was not the product of improper conduct by police.  565 U.S. at 245.  The Court explained that the primary aim of excluding identification evidence is to "deter law enforcement use of improper lineups, showups, and photo arrays," _id._ at 241, and that this aim is not served "in cases [ ] . . . in which the police engaged in no improper conduct."  _Id._ at 242.  And the Court declined to "open the door to judicial preview, under the banner of due process," of identifications made without improper police conduct but under "suggestive circumstances."  _Id._ at 244.  The Court noted:

> Most eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do.  Out-of-court identifications volunteered by witnesses are also likely to involve suggestive circumstances.  For example, suppose a witness identifies the defendant to police officers after seeing a photograph of the defendant in the press captioned "theft suspect," or hearing a radio report implicating the defendant in the crime.  Or suppose the witness knew that the defendant ran with the wrong crowd and saw him on the day and in the vicinity of the crime.  Any of these circumstances might have "suggested" to the witness that the defendant was the person the witness observed committing the crime.

_Id._ at 244.  The Court recognized that the jury, not the judge, traditionally determines the reliability of evidence.  _Id_. at 245.  The court also took into account the safeguards

built into the adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability, including (1) the defendant's right to confront the eyewitness through cross-examination, (2) defense counsel's opportunity to expose the flaws in the eyewitness' testimony and focus the jury's attention on the fallibility of such testimony during opening statements and closing arguments, (3) any jury instructions which warn the jury to take care in appraising identification evidence, (4) the constitutional requirement that the government prove the defendant's guilt beyond a reasonable doubt (which impedes convictions based on dubious identification evidence), and (5) evidentiary rules which permit trial judges to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact or potential for misleading the jury.  *Id.* at 245–47.  For these reasons, the <u>Perry</u> Court held that the Due Process Clause does not require a court to determine the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement.  *Id.* at 248.

The identification evidence at issue in Petitioner's case (i.e., the child victim's in-court identification of Petitioner as "Joe") was not the product of police arrangement or misconduct; indeed, there is no dispute that this case did not involve

a prior out-of-court identification procedure arranged by law enforcement (e.g., a line-up, photo line-up, or show-up).   Instead, this case involves only an in-court identification, which Petitioner argues was in response to an unnecessarily suggestive question by the prosecutor.

The allegedly objectionable identification came just after the prosecutor elicited testimony from the child victim, who had just turned seven years old, that: she understood she had to tell the truth; she understood that everything she said had to be "what really happened"; and she promised the judge that she would tell the truth and "only speak about what really happened" (Ex. B at 24–25).   The prosecutor then asked the victim:

Q.  (By Ms. Pace)   [D]o you know why you're here today?

A.  No, ma'am.

Q.  Do you know why you're here in the courtroom to speak?

A.  Uh-huh.

Q.  Okay.  Can you tell the ladies and gentlemen over here in the jury why it is that you are here today to speak?

A.  (Witness shrugs shoulders).

Q.  Can you tell him?

A.  I don't know.

Q.  You don't know?  Do you know who the man is over in the red shirt over there?

A.  Joe.

Q.  Joe.  Okay.  How do you know him?  Have you met him before today?

A.  Not lately.

Q.  How did you first meet Joe?

A.  (Witness shrugs shoulders).

Q.  Where have you seen him before today?

A.  (Witness shrugs shoulders).

Q.  You don't know?

A. No.

. . . .

Q.  [W]hen did you first see Joe?

A.  At my mom's old apartment.

Q.  At your mom's old apartment?  Okay, and do you know what city that was in?

A.  Uh-uh.

Q.  No, okay.  Did Joe ever live with you?

A.  (Witness shrugs shoulder).

Q.  Where did you see him at your mom's old apartment?

A.  In my bedroom.

Q.  In your bedroom?  Okay, and where was your bedroom?

A.  Up the stairs and you go straight.

Q.  All right.  Were you—did you sleep in that bedroom?

A.  I slept on the couch.

Q.  Who slept in your bedroom?

A.  Joe.

Q.  Joe?

A.  (Witness indicates affirmatively).

Q.  Did Joe have clothes at the house in your bedroom?

A.  To change into.

Q.  To change into?  Okay.  Who else lived at the house when Joe was staying in your bedroom?

A.  My mom.

Q.  Anybody else?  Just you and your mom?

A.  That's it.

. . . .

Q.  Did something happen with Joe?

A.  I don't know.

Q.  Do you not know or do you not remember?

A.  I don't know.

Q.  Did you tell someone that something happened with Joe?

A.  I told—

Q.  What did you tell?  Can you tell these ladies and gentlemen? What did you tell?

A.  I told my mom what happened.

Q.  Okay.  What did you tell your mom happened?

A.  That—

Q.  Can you tell these ladies and gentlemen of the jury what you told your mom happened?

A.  I think.

Q.  Okay.  Well, go ahead and tell them.

A.  He grabbed my hand and put it on his front.

Q.  On his front?

A.  (Witness indicates affirmatively).

Q.  When you say "he" are you talking about Joe?

A.  Yes.

Q.  Where did that happen?

A.  In my mom's old apartment.

Q.  Do you remember, did it happen in a particular part of the house?

A.  In my bedroom.

(Ex. B at 26–29).  The victim then testified that Joe grabbed her hand, put her hand on his "wiener," which she described as "slimy," and made her hand "go back and forth" (*id.* at 30–31).

During the post-conviction evidentiary hearing, Petitioner questioned Attorney Weekley as to why he did not pursue a mistaken identity theory by showing the victim a photograph of James Dean Dickerson or presenting evidence that Dickerson had inappropriately kissed the victim (Ex. I at 795–96, Ex. J at 805).  Attorney Weekley responded that the victim had consistently stated that the man who placed her hand on his bare penis was "Joe, who lives with my mom," and the only variation from that was when the victim refused to answer questions during her deposition (Ex. J at 805, 808).  Attorney Weekley testified that there was no pre-trial line-up, "But I think she knew who she was talking about when she said, Joe, who lives with my mom.  There was not another Joe that you ever made me aware of that lived in that house" (*id.* at 808).

The court questioned Attorney Weekley about the identification issue as follows:

THE COURT:  The point is that the mother of the victim and the defendant all resided together?

MR. WEEKLEY:  That is correct.

THE COURT:  All right.  And it wasn't just like a day or so, it was a long period of time, whether it be six months or a year?

MR. WEEKLEY:  That correct [sic].

THE COURT:  So as a defense counsel, you wouldn't see it as one of those cases where it was a case of mistaken identity?

MR. WEEKLEY:  No.

THE COURT:  Like, for example, I tried one I think that was just PCA'd the other day where the victim only saw the defendant one time at a party and that's the only time in her life she ever saw him.  That that would be a case where you would really want to make—it all comes down to identity.  This wasn't one of those type cases?

MR. WEEKLEY:  No.  This is not an identity case.  There were several months when both the mother, the alleged victim—and Mr. Savicki agreed they all lived in the same house.

(Ex. J at 806–07).  During the evidentiary hearing, Petitioner told the court he began residing at the apartment with Stacy Williams at the end of August of 2011, and stayed there until November 24, 2011 (Ex. J at 824).  And in one of Petitioner's submissions to the post-conviction court (a letter to the Milton Housing Authority), Petitioner stated he resided at the apartment with Stacy Williams from mid-June of 2011 through November of 2011 (*see* Ex. I  at 694–95).

The state court reasonably concluded that Attorney Weekley was not deficient for failing to object to, or move for suppression of, the victim's identification testimony on the ground that it was the product of the prosecutor's unnecessarily suggestive question.  Prior to trial, the child consistently identified "Joe" as the man who put her hand on his bare penis.  At trial, the prosecutor simply asked the child if she knew Petitioner, and the victim readily identified Petitioner as "Joe."  This was prior to the prosecutor's eliciting any testimony from the victim about the specifics of the molestation, or who perpetrated it.  Petitioner failed to show that counsel had a meritorious basis to seek exclusion of the victim's identification on the ground that the prosecutor's question created a substantial likelihood of misidentification, or that the probative value of the identification testimony was substantially outweighed by the danger of unfair prejudice or misleading the jury, *see* Fla. Stat. § 90.403.  For these reasons, the state court also reasonably concluded that Petitioner failed to show he was prejudiced by defense counsel's failure to object to, or seek suppression of, the victim's identification testimony.  Therefore, Petitioner is not entitled to federal habeas relief on Ground Four.

    E.    <u>Ground Five:  "IOC [sic]—failure to contact, investigate, and present alibi witnesses."</u>

Petitioner alleges that in several sworn pre-trial statements, Stacy Williams (the victim's mother) stated that (1) she observed a drastic change in the victim's demeanor towards Petitioner on November 24, 2011, (2) this observation led her (Williams) to question the victim, (3) Williams' questioning resulted in the victim's disclosing the sexual molestation allegation, and (4) Williams then reported the allegation to law enforcement (ECF No. 17 at 34–35; ECF No. 32 at 37–).  Petitioner alleges he informed Attorney Weekley that Ms. Williams' statements were lies, because he had been at his fiancée's house from the evening of November 23 through the late afternoon of November 24, 2011, and then went to his mother's house until the early evening of November 24 (*id.*).  Petitioner alleges he told Attorney Weekley that when he returned to Ms. Williams' apartment on November 24, neither the victim nor Ms. Williams were there, and he did not see them until later that evening when law enforcement arrived and forced him to leave (*id.*).  Petitioner contends Attorney Weekley was ineffective for failing to contact "potential witnesses" (*id.*).  Petitioner contends one of these witnesses was Tarah C. Freeman, who would have testified that Ms. Williams was with her and Brian Morris (Freeman's boyfriend) on November 24, 2011 (*see* ECF No. 32 at 38–39).

Respondent concedes Petitioner exhausted this IATC claim (ECF No. 27 at 26).

Respondent contends the state court's adjudication of Petitioner's claim was not

contrary to or an unreasonable application of clearly established federal law (*id.* at

27–29).

      1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

      2.      Federal Review of State Court Decision

Petitioner presented this claim as Claim #5 of his second amended Rule 3.850

motion (Ex. H at 463–65).  Petitioner identified Kara Lindsey Allen (Petitioner's

fiancée) and Patricia Faulkner (Petitioner's mother) as the potential witnesses whom

Attorney Weekley should have contacted (*id.*).

The state circuit court adjudicated the claim as follows:

**<u>Claim Five—Failing to Call, Interview, and Present Alibi Witnesses</u>**

> Defendant alleges that counsel was ineffective for failing to call,
> interview and present alibi witnesses.  Defendant claims that Ms.
> Williams could not have observed the child victim's reaction to
> Defendant on November 24, 2011, (Thanksgiving) because Defendant
> was not present at Ms. Williams' residence on November 24, 2011.
> Defendant alleges he told counsel he spent the night of November 23,
> 2011, over at his girlfriend's, and on November 24, 2011, after dropping
> his girlfriend off at a friend's house, Defendant went to his mother's
> apartment in Pace where he spent Thanksgiving.  When Defendant
> arrived back at Ms. Williams' residence on November 24, 2011, nobody

was home.  He didn't see Ms. Williams and the child victim until the Milton Police Department served the 72 hour domestic violence injunction on Defendant.  Defendant claims counsel failed to contact Kara Linsey Allen and Patricia Lynanne Faulkner who were both available to testify, and who would have confirmed Defendant's rendition of events for November 24, 2011.  Defendant claims that the alibi witnesses' testimony would have substantiated and corroborated Defendant's "actual and factual innocence" and had counsel contacted the witnesses and developed the evidence, the jury would not have found Defendant guilty.

The record demonstrates that Ms. Allen's and Ms. Faulkner's testimony regarding the events of November 23 and 24, 2011, would not have substantiated Defendant's innocence and would not have changed the result of Defendant's trial.  Initially, Defendant admits he returned to Ms. Williams' residence on November 24, 2011.  The proposed alibi witnesses' testimony only shows that Defendant left his Thanksgiving meal at 5:00 pm—it does not corroborate Defendant's account that nobody else was at the residence when he arrived on November 24, 2011.  Consequently, neither of the witnesses would be considered true "alibi" witnesses in this regard.

Additionally, even though Ms. Williams initially testified the child victim's demeanor toward Defendant changed on November 24, 2011,[FN 36] Ms. Williams confirmed that she reported the child victim's demeanor had changed over "the last few days" in her November 24, 2011 statement to law enforcement.[FN 37]  If Defendant wanted the proposed alibi testimony introduced to impeach Ms. Williams' statement regarding the November 24, 2011 demeanor change, Ms. Williams' testimony was already effectively impeached by her own statement to police.

Most importantly, the issue of whether Ms Williams noticed a demeanor change in the child victim on November 24, 2011, or even some other time is ancillary to the charges in this case.  Although Ms. Williams reported the abuse of the child victim to law enforcement on

November 24, 2011, the record shows that the actual instance of molestation occurred sometime before November 24, 2011.[FN 38] Neither Ms. Allen's nor Ms. Faulkner's testimony would have established that Defendant did not molest the child victim.  Because of the limited scope of the proposed witnesses' testimony, Defendant has failed to demonstrate that his counsel was deficient or that he was prejudiced by counsel's failure to call, interview and present these "alibi" witnesses. Defendant is not entitled to relief as to this claim.

(Ex. J at 913–15) (footnotes citing to trial transcript omitted).  The First DCA affirmed the decision without written opinion (Ex. U).

Initially, none of the alleged "alibi" witnesses actually established an alibi to the molestation charge.  Ms. Williams reported the allegation of molestation on November 24, 2011, but all of the evidence showed that the child reported it months prior to that.  Therefore, the proposed testimony of Petitioner's fiancée and his mother regarding his whereabouts on November 24, and Ms. Freeman's proposed testimony about Ms. Williams' whereabouts on that day, would not have established an alibi to the charge.  Thus the only value of any testimony regarding Petitioner's and Ms. Williams' whereabouts on November 24, 2011, was to impeach Ms. Williams' testimony, that she noticed a change in the victim's demeanor when she was around Petitioner that day (*see* Ex. B at 114).  However, Attorney Weekley destroyed Ms. Williams' credibility by exposing numerous instances of Ms. Williams' providing conflicting information in her trial testimony and her sworn written statements to

police and in court documents; indeed, Attorney Weekley even elicited Ms. Williams'

outright admission that she provided false information in her sworn written statements

(Ex. B at 116–17, 119–25, 135–42). Even the trial court commented during a bench

conference that Attorney Weekley had "significantly" impeached Ms. Williams'

credibility (*id.* at 186). The state court thus reasonably concluded that Petitioner was

not prejudiced, in the <u>Strickland</u> sense, by Attorney Weekley's failure to present

testimony regarding his and Ms. Williams' whereabouts on November 24, 2011.

Petitioner has not demonstrated that the state court's adjudication of Ground

Five was based upon an unreasonable determination of fact, or that was it contrary to

or an unreasonable application of <u>Strickland</u>. Therefore, Petitioner is not entitled to

federal habeas relief on Ground Five.

F.    <u>Ground Eight:  "IOC [sic]—misadvising Petitioner not to testify."</u>

Petitioner alleges defense counsel was ineffective for advising him that he

should not testify because the State would introduce Petitioner's prior crimes of

dishonesty (specifically, thefts) to impeach him, and the jury would not believe his

testimony (ECF No. 17 at 50–52; ECF No. 32 at 51–56). Petitioner alleges Attorney

Weekley never explained that the jury could still choose to believe him even if his

testimony was impeached with his prior felony convictions (ECF No. 1 at 50).

Petitioner alleges if counsel had advised him of this, he would have testified (*id.*).

Petitioner alleges he would have testified "about what had been going on in the

residence" and Ms. Williams' motives to fabricate, specifically, her desire to steal and

sell his used electronics to support her drug habit, and her fear that she would lose

custody of her children and her subsidized apartment if Petitioner followed through

with his threats to report her to child protective services and the public housing

authority if she did not "clean her life up" (ECF No. 17 at 50; ECF No. 32 at 51–54).

Petitioner contends his testimony would have cast reasonable doubt on the State's

case (*id.*).

Petitioner alleges another reason defense counsel advised him not to testify was

that there was no other evidence to support his testimony (*see* ECF No. 17 at 50–51).

Petitioner alleges if defense counsel had investigated and obtained "even one witness

or single piece of evidence" that would have supported his testimony, for example, the

officer who was present on November 28, 2011, when Petitioner found some of his

personal belongings in Ms. Williams' bedroom, he would have exercised his right to

testify (ECF No. 17 at 51; ECF No. 32 at 51–53).

Respondent concedes Petitioner exhausted this IATC claim (ECF No. 27 at 45).

Respondent contends the state court's adjudication of Petitioner's claim was not

contrary to or an unreasonable application of clearly established federal law (*id.* at 46–48).

### 1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

### 2.    Federal Review of State Court Decision

Petitioner presented this claim as Claim #8 of his second amended Rule 3.850 motion (Ex. H at 472–73).  The state circuit court adjudicated the claim as follows:

> **Claim Eight—Advising Defendant not to Testify**
>
> Defendant further alleges that counsel was ineffective in advising Defendant not to testify.  Defendant alleges counsel informed him the State would introduce Defendant's prior convictions to impeach him and the jury would know Defendant as an "ex-con."  Defendant further claims that counsel did not want Defendant to testify because it would contradict counsel's theory of defense.
>
> Defendant's claim is refuted by the record.  Counsel's advice to Defendant regarding his prior convictions being used to impeach Defendant's testimony is absolutely correct.  In fact, during a bench conference when defense counsel was trying to get into evidence Defendant's statement, the Court cautioned counsel:  "You want to be very careful.  Does your client have a prior record?"  Counsel replied, "Yes."  The Court further stated:  "If you introduce his statement, she can impeach him with a record.  She can impeach his statement with a prior record."[FN 82]
>
> Additionally, the record shows that Defendant exercised his independent decision not to testify at his trial.  Defendant confirmed on the record that he understood it was his absolute right to testify if he

chose to do so; the decision not to testify was his alone; he had an adequate opportunity to discuss with his attorney the advantages and disadvantages of testifying; and no threats or promises had been made to get Defendant not to testify.[FN 83] Consequently, Defendant has failed to demonstrate that counsel was deficient and Defendant was prejudiced. Defendant is not entitled to relief as to this claim.

(Ex. J at 930–31) (footnotes citing to transcripts of trial and post-conviction evidentiary hearing omitted).  The First DCA affirmed the decision without written opinion (Ex. U).

As discussed *supra* in Grounds Two, Six, and Seven, the state court reasonably concluded that Attorney Weekley made a reasonable strategic decision to pursue the defense theory that the testimony of the child victim was not trustworthy, and the testimony of the victim's mother (Stacy Williams) was completely incredible.  And counsel reasonably decided that the most effective way to impeach Stacy Williams' testimony was with her own prior inconsistent statements.  Therefore, counsel's failure to investigate evidence of Ms. Williams' possible motivations to fabricate an allegation against Petitioner was not deficient and thus did not render Petitioner' waiver of his right to testify involuntary.

Additionally, defense counsel's advice concerning the State's ability to use Petitioner's prior felony convictions to attack his credibility was reasonable.  *See* Fla. Stat. § 90.610(1).  Counsel's failure to additionally advise Petitioner that the jury

could still choose to believe him, even after the State established that he was a convicted felon, did not amount to conduct "outside the wide range of professionally competent assistance."

Petitioner has not demonstrated that the state court's adjudication of Ground Eight was based upon an unreasonable determination of fact, or that was it contrary to or an unreasonable application of <u>Strickland</u>. Therefore, Petitioner is not entitled to federal habeas relief on Ground Eight.

G.    <u>Ground Nine: "Brady violation."</u>

Petitioner alleges that on April 27, 2017, Stacy Williams was arrested for a narcotics violations that occurred on November 28, 2011 (ECF No. 17 at 52–53; ECF No. 32 at 56–58). Petitioner alleges the charges were pending during his trial, and the State dropped the charges eight days after his trial (*id.*). Petitioner alleges this "indicat[es] a likelihood that the State had threatened or promised Ms. Williams something relating to those pending charges, and the State never revealed whether it had or not" (*id.* at 52). Petitioner alleges that even though Ms. Williams' credibility was impeached at trial, Attorney Weekley could have used information regarding any threats or promises to Ms. Williams by the State to impeach the child victim "with any such expectations on her mother's behalf" (*id.*).

Petitioner additionally contends the State failed to disclose that James Dean Dickerson was charged in the Circuit Court for Escambia County, Florida, with lewd and lascivious molestation of a different victim during the same time frame as Petitioner's charge (ECF No. 32 at 58–61).

Respondent concedes Petitioner exhausted this claim (ECF No. 27 at 48). Respondent contends the state court's adjudication of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 48–50).

1.      Clearly Established Federal Law

As recognized in Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) and its progeny, principles of due process dictate that, in a criminal proceeding, the prosecution must disclose evidence favorable to the defendant.  Brady, 373 U.S. at 87; Banks v. Dretke, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004).  To establish a Brady violation, a defendant must prove three essential elements:  (1) that the evidence was favorable to the defendant, either because it is exculpatory or impeaching; (2) that the prosecution suppressed the evidence, either willfully or inadvertently; and (3) that the suppression of the evidence resulted in prejudice to the defendant.  Turner v. United States, — 582 U.S. —, 137 S. Ct. 1885,

1893, 198 L. Ed. 2d 443 (2017); Banks, 540 U.S. at 691; Strickler v. Greene, 527 U.S.

263, 281–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999).

To establish prejudice, the defendant must show that the suppressed evidence

was material.  Banks, 540 U.S. at 691.  The evidence rises to the level of materiality

within the meaning of Brady when there is a reasonable probability that, had the

suppressed evidence been disclosed, the result of the proceeding would have been

different.  Turner, 137 S. Ct. at 1893.  "A reasonable probability of a different result

is one in which the suppressed evidence undermines confidence in the outcome of the

trial."  Id. (internal quotation marks and citations omitted).

In determining whether disclosure of the suppressed evidence might have

produced a different result, the court must consider the "totality of the circumstances."

United States v. Bagley, 473 U.S. 667, 683, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

The court "must examine the trial record, 'evaluat[e]' the withheld evidence 'in the

context of the entire record,' and determine in light of that examination whether 'there

is a reasonable probability that, had the evidence been disclosed, the result of the

proceeding would have been different.'"  Turner, 137 S. Ct. at 1893 (quoting United

States v. Agurs, 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), and Cone

v. Bell, 556 U.S. 449, 470, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009)).

2.    Federal Review of State Court Decision

a.    State's failure to disclose evidence concerning Ms. Williams' drug charge

Petitioner presented this alleged <u>Brady</u> violation as claim as Claim #10 of his second amended Rule 3.850 motion (Ex. H at 475–76).  The state circuit court adjudicated the claim as follows:

**<u>Claim Ten—State Failed to Disclose Impeachment Information</u>**

Lastly, Defendant alleges that the State committed a <u>Brady</u> violation by failing to disclose to Defendant that Ms. Williams' drug offense charges were *nolle prosequed* eight days after Defendant's trial. Defendant further argues that because the State commented extensively in closing arguments that no motive was ever shown for either Ms. Williams or the child victim to lie at trial, the State has already conceded the third prong of <u>Brady</u>.

"To establish a <u>Brady</u> violation, a defendant must show:  (1) evidence favorable to the accused, because it is either exculpatory or impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that prejudice ensued." <u>Guzman</u>, 868 So. 2d 498, 508 (Fla. 2003) (citation omitted).

Even assuming the evidence was considered impeaching and it had been suppressed by the State, as discussed previously in this Order, Defendant was not prejudiced as counsel had already impeached Ms. Williams' credibility at trial without the benefit of such information. Consequently, Defendant has failed to demonstrate a <u>Brady</u> violation occurred, and he is not entitled to relief as to this claim.

(Ex. J at 932–33).  The First DCA affirmed the decision without written opinion (Ex. U).

Petitioner's trial was on May 23, 2013 (*see* Exs. B, C).  At the post-conviction evidentiary hearing, Attorney Weekley testified that he was aware, prior to trial, that Stacy Williams was arrested on April 27, 2012 (Ex. I at 772–73).  One of the exhibits submitted by Petitioner with his second amended Rule 3.850 motion, and which the state court considered (*see* Ex. I at 815–16), was a copy of the Case Progress Docket of Ms. Williams' criminal case, Case No. 2012-CF-000616, obtained from the Santa Rosa County Clerk of Court's public website (Ex. H at 597–99).  It was a matter of public record that Stacy Williams was arrested on April 27, 2012, for one count of possession of a controlled substance without a prescription in violation of Florida Statutes § 893.13(6)(a), a third degree felony, and one count of possession and/or use of drug equipment in violation of § 893.147(1), a first degree misdemeanor (*see id.*). It was also a matter of public record that on July 20, 2012 (prior to Petitioner's trial), the State Attorney, Ms. Williams, and the trial court agreed to Ms. Williams' release to a pre-trial intervention program (*see id.*).[7]  It was also public record that the State

---

[7] Florida law provides:

(2) Any first offender, or any person previously convicted of not more than one nonviolent misdemeanor, who is charged with any misdemeanor or felony of the third degree is eligible for release to the pretrial intervention program on the

Attorney has the final authority to determine whether Ms. Williams' charges should

be dropped, and that the charges had not been dropped at the time of Petitioner's trial,

on May 23, 2013 (*see id.*).

---

approval of the administrator of the program and the consent of the victim, the state attorney, and the judge who presided at the initial appearance hearing of the offender. However, the defendant may not be released to the pretrial intervention program unless, after consultation with his or her attorney, he or she has voluntarily agreed to such program. . . .

(3) The criminal charges against an offender admitted to the program shall be continued without final disposition for a period of 90 days after the date the offender was released to the program, if the offender's participation in the program is satisfactory, and for an additional 90 days upon the request of the program administrator and consent of the state attorney, if the offender's participation in the program is satisfactory.

(4) Resumption of pending criminal proceedings shall be undertaken at any time if the program administrator or state attorney finds that the offender is not fulfilling his or her obligations under this plan or if the public interest so requires.  . . .

(5) At the end of the intervention period, the administrator shall recommend:

(a) That the case revert to normal channels for prosecution in instances in which the offender's participation in the program has been unsatisfactory;

(b) That the offender is in need of further supervision; or

(c) That dismissal of charges without prejudice shall be entered in instances in which prosecution is not deemed necessary.

The state attorney shall make the final determination as to whether the prosecution shall continue.

Fla. Stat. § 948.08(2)–(5).

Since Ms. Williams' charges, the status of those charges, and her participation in the pre-trial intervention program were matters of public record, Petitioner failed to satisfy the "suppression" component of a <u>Brady</u> violation. *See* <u>Wright v. Hopper</u>, 169 F.3d 695, 702 (11th Cir. 1999); *see also, e.g.*, <u>United States v. Barroso</u>, 719 F. App'x 936, 941 (11th Cir. 2018) (unpublished but recognized as persuasive authority) (rejecting <u>Brady</u> claim based upon government's failure to disclose information available on public records website, because "it would strain credulity to conclude that the government would withhold and suppress information that was placed in a public records website which the defendants could easily access); <u>United States v. Cook</u>, 170 F. App'x 639, 640 (11th Cir. 2006) (rejecting <u>Brady</u> claim based upon government's failure to disclose a trial witness's criminal history from 1999 to 2001, the fact that the witness was on probation at the time he testified at defendant's trial, and the fact that probation revocation proceedings had commenced against the witness, because defendant failed to show that he could not have possessed this evidence with reasonable diligence).

Moreover, as the state court determined, Attorney Weekley destroyed Ms. Williams' credibility with evidence of her prior inconsistent statements contained in sworn written statements she provided to police and the court. Evidence of her

pending criminal charges, including whether or not the State had promised or threatened anything in exchange for her testimony in Petitioner's case, would have been merely cumulative impeachment evidence.

Petitioner failed to establish that the state court's adjudication of this <u>Brady</u> claim was based upon an unreasonable determination of fact, or contrary to or an unreasonable application of clearly established federal law.

> b.    <u>State's failure to disclose evidence that James Dean Dickerson was charged in the Circuit Court for Escambia County, Florida, with lewd and lascivious molestation of a different victim during the same time frame as Petitioner's charge.</u>

Petitioner presented this alleged <u>Brady</u> violation in his third successive Rule 3.850 motion (Ex. DD at 944–63). The state circuit court adjudicated the <u>Brady</u> claim as follows:

> To establish a *Brady* violation, a defendant must allege facts that demonstrate that "(l) the State possessed evidence favorable to the accused because it was either exculpatory or impeaching; (2) the State willfully or inadvertently suppressed the evidence; and (3) the defendant was prejudiced." *Allen v. State*, 854 So. 2d 1255, 1259 (Fla. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). To establish prejudice, a defendant must demonstrate that the evidence was material by showing that the results of the proceeding would have been different if the evidence had been disclosed to the defense. *Id.* at 1260 (citing *Strickler*, 527 U.S. at 280).
>
> Defendant argues that the evidence of Mr. Dickerson's conviction in Escambia County was exculpatory because it could have given the

jury reasonable doubt as to whether Defendant or Mr. Dickerson molested the victim.  He claims that the evidence was suppressed by the State because the State had prosecuted Mr. Dickerson in Escambia County, and he states that he made the State aware of the "kissing incident" on October 24, 2014, when he filed his second amended 3.850 motion for postconviction relief and again on August 18, 2015, during the evidentiary hearing on his motion.  Defendant also argues that the State was aware of the "kissing incident" through the activities of the Milton Police Department, which processed the complaint made by Defendant regarding the "kissing incident."  Finally, Defendant claims that he was prejudiced because trial counsel could have argued that Mr. Dickerson could have molested the victim during the "kissing incident" or that the victim's mother or Mr. Dickerson himself manipulated her to identify Defendant rather than Mr. Dickerson as the one who molested her.  In addition, he points out that trial counsel stated that evidence of Mr. Dickerson's conviction "would have been helpful" had they decided on the defense theory of blaming Mr. Dickerson.

Defendant has failed to establish a *Brady* violation.  Although the State prosecuted Mr. Dickerson in Escambia County and would have been aware of the "kissing incident" through the Milton Police Department as Defendant alleges in his motion, Defendant has made no showing that the State was aware of any significance of Mr. Dickerson's convictions in relation to his case until he raised the issue in his second amended motion, filed on October 24, 2014, more than one year after his trial.  Thus, Defendant has failed to show that the State possessed exculpatory information that would have benefited [sic] the defense at trial.  Secondly, given the Court's conclusion that the conviction could have been discovered at the time of trial, the Court does not conclude that suppression occurred.  In addition, Defendant has failed to show the materiality of the evidence as "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *U.S. v. Agurs*, 427 U.S. 97, 109–10 (1976).  Consequently, the Court finds that this claim should be denied.

(Ex. DD at 985–91).  The First DCA affirmed without written opinion.  <u>Savicki v.</u>

<u>State</u>, No. 1D17-3484, 2018 WL 1223092 (Fla. 1st DCA Mar. 9, 2018) (Table).

The state court's phrasing of <u>Brady</u>'s materiality standard deviates from the

standard stated by the Supreme Court.  The Supreme Court defined materiality as

showing "<u>a reasonable probability that</u>, had the suppressed evidence been disclosed,

the result of the proceeding would have been different," *see* <u>Turner</u>, 137 S. Ct. at

1893; whereas the state court in Petitioner's case defined materiality as showing "that

the results of the proceeding would have been different."  It thus appears that the state

court reached a conclusion of law that contradicts one reached by the Supreme Court,

which satisfies the "contrary to" prong of § 2254(d)(1).

Nevertheless, Petitioner is not entitled to federal habeas relief, because his

allegations fail to show a <u>Brady</u> violation.  Petitioner obviously knew that James Dean

Dickerson allegedly kissed the victim, as evidenced by the fact that he reported the

conduct to 911 on August 28, 2011, and he was interviewed by the Milton Police

Department when police investigated Petitioner's report the same day (Ex. DD at

120–22).  Additionally, evidence that James Dean Dickerson was charged in another

county with lewd or lascivious conduct in relation to a different victim, and the

disposition of those charges, was a matter of public record.[8]  The defense could have

obtained, with due diligence, information about Mr. Dickerson's arrest and conviction.

Petitioner thus failed to satisfy the "suppression" element of a <u>Brady</u> violation.

For these reasons, Petitioner is not entitled to federal habeas relief on either of

the <u>Brady</u> claims presented in Ground Nine.

H.    <u>Ground Ten:  "Giglio violations."</u>

Petitioner alleges the State committed <u>Giglio</u> violations with respect to the trial

testimony of Stacy Williams and Michelle Zebracki (ECF No. 17 at 54–58; ECF No.

32 at 61–72).  For example, Petitioner alleges Stacy Williams testified at trial that

there were no other roommates staying at her apartment; but a Milton Police

Department Call History Report showed that Williams called police on November 12,

2011 to have Tarah C. Freeman removed from the apartment, and that Raymond Tiller

and Iesha Gooden were also at the apartment when police arrived (ECF No. 17 at

54–55; ECF No. 32 at 69–71).  Petitioner alleges Department of Children and Families

---

[8] The public website of the Escambia County Clerk of Court indicates that on December 16, 2011, James Dean Dickerson was charged in Case No. 2011-CF-005649, with six counts of lewd or lascivious behavior with a victim aged 12 to 16 years, three counts of causing a child to commit an act of delinquency, and one count of interference with the custody of a minor.  Mr. Dickerson was arrested on the charges on November 18, 2011.  On July 11, 2012, Dickerson pleaded no contest to one charge of lewd or lascivious behavior and one count of causing a child to commit an act of delinquency.  On August 21, 2012, the State dismissed the remaining counts, and Dickerson was sentenced to eight years in prison on the lewd and lascivious behavior count, and a concurrent term of eleven months and fifteen days on the other count.

("DCF") records also referenced a statement by Ms. Williams that she "kicked out" two people who had been staying at the apartment (*id.*). Petitioner alleges the State was aware of this "perjury" (*id.*).

Petitioner alleges Stacy Williams also committed perjury when she testified that she was evicted within a couple of days of November 24, 2011, which was why she did not have a picture allegedly drawn by the victim (ECF No. 17 at 57; ECF No. 32 at 63–66). Petitioner alleges Ms. Williams was not evicted until September 24, 2012, as evidenced by a return of service executed in relation to a subpoena for Ms. Williams' pre-trial deposition (*id.*).

Petitioner alleges Stacy Williams also committed perjury when she testified that Petitioner lived with her "almost a year" (ECF No. 32 at 67). Petitioner alleges DCF records include statements from Ms. Williams that contradict this testimony (*id.* at 67–68). Petitioner further alleges his own records (from a past landlord and a cable television company) prove that he did not live with Ms. Williams until the last week of August of 2011 (*id.* at 67–68).

Petitioner alleges Michelle Zebracki committed perjury when she testified that the victim told her about the molestation after the victim told Charlotte Williams, the victim's grandmother (ECF No. 17 at 55–56). Petitioner alleges in the DCF records

dated November 25, 2011, the DCF investigator stated that she interviewed Charlotte Williams, who stated that nobody told her that the victim had been molested (*id.*).

Petitioner additionally alleges Michelle Zebracki testified that the allegation "came out" in July, August, and September of 2011, yet in the DCF records dated November 25, 2011, the investigator indicated that Ms. Zebracki stated that the allegation "came out she thinks" the previous Monday, November 21, 2011 (ECF No. 17 at 56). Additionally, the CPT records stated that Jerry Weekley, Ms. Zebracki's fiancé, told CPT Case Coordinator Leilani Mason that the victim told Ms. Zebracki about the molestation on November 21, 2011 (*id.*). Petitioner alleges both the State and defense counsel was aware of this "perjury" (*id.*).

Respondent concedes Petitioner exhausted this IATC claim (ECF No. 27 at 51). Respondent contends the state court's adjudication of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 51–53).

        1.    Clearly Established Federal Law

In Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), the Supreme Court held that the government's failure to correct false testimony of its key witness (specifically, that the witness had received no promise of non-prosecution

in exchange for his testimony), as well as the prosecutor's false statement to the same effect in closing argument, required a new trial.  The Court explained that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice."  405 U.S. at 153 (citation and internal quotation marks omitted).

The Giglio Court made clear, however, that such errors do not automatically require reversal, and articulated a "materiality" standard to guide the determination of whether a new trial is warranted:

> We do not . . . automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.  A finding of materiality of the evidence is required under Brady.  A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."

Id. (citations and internal quotation marks omitted) (quoting Napue v. Illinois, 360 U.S. 264, 271, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).  Because "the Government's case depended almost entirely on [the falsely testifying witness's] testimony," the Court reasoned, his "credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."  Id. at 154–55.  Accordingly, the Court reversed the judgment of conviction.

Since <u>Giglio</u>, the Supreme Court "has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." <u>United States v. Agurs</u>, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) (footnote omitted); *see also* <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 & n.7, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); <u>United States v. Bagley</u>, 473 U.S. 667, 677, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

The "any reasonable likelihood" standard differs from the materiality standard applicable to other types of <u>Brady</u> violations because of the nature of the error. *See* <u>Ventura v. Attorney Gen., Fla.</u>, 419 F.3d 1269, 1278 (11th Cir. 2005). As the Supreme Court has explained, "the Court has applied a strict standard of materiality [to <u>Giglio</u> violations], not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." <u>Agurs</u>, 427 U.S. at 104.

The Eleventh Circuit expressly applies a perjury standard for <u>Giglio</u> claims. "To establish prosecutorial misconduct for the use of false testimony, a defendant must show the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material."

United States v. McNair, 605 F.3d 1152, 1208 (11th Cir. 2010). This means that the false testimony must be given with "willful intent" and "not as a result of mistake, confusion, or faulty memory." *Id.*

   2.  Federal Review of State Court Decision

  Petitioner presented a <u>Giglio</u> claim with respect to Stacy Williams' testimony as Claim #9 of his second amended Rule 3.850 motion (Ex. H at 474–75). The state circuit court adjudicated the claim as follows:

### **Claim Nine—State Introduced Perjured Testimony**

  Defendant next alleges that the State committed a <u>Giglio</u> violation because it permitted Ms. Williams to offer perjured testimony at trial. Defendant further alleges that the State knew or should have known Ms. Williams' testimony was "perjury,' yet it made no attempt to correct the testimony or notify the Court. In referencing exhibits attached to his amended motion and the trial transcript, Defendant appears to allege that the substance of Ms. Williams' "perjured" testimony was that Defendant was her only roommate; Ms. Williams gave varying statements regarding how long Defendant lived with her; and Ms. Williams testified incorrectly regarding when she was evicted from her home. Defendant claims these were not the only instances of perjury Ms. Williams committed.

    "A <u>Giglio</u> violation is demonstrated when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. Under this standard, the State has the burden

> to prove that the false testimony was not material by
> demonstrating it was harmless beyond a reasonable doubt."

Davis v. State, 26 So. 3d 519, 532 (Fla. 2009) (citations omitted;
emphasis in original).

> Initially, this claim appears to be facially insufficient as Defendant
> has failed to allege there is a reasonable possibility that the alleged false
> evidence could have affected the jury's verdict.  To the extent Defendant
> claims there are other non-enumerated instances of  perjury committed
> by Ms. Williams, these allegations are also facially insufficient for lack
> of specificity.  The Court questions whether all of the testimony in
> question can even be identified as false, but even assuming the State
> knew the testimony was false and failed to correct such, the "false"
> evidence alleged could not have possibly affected the jury's verdict in
> this case.  Defendant has failed to demonstrate a Giglio violation has
> occured and he is not entitled to relief as to this claim.

(Ex. J at 931–32).  The First DCA affirmed the decision without written opinion (Ex.

U).

It again appears that the state court used a different materiality standard than the

Supreme Court.  The state court used an "any reasonable possibility" standard,

whereas the Supreme Court uses an "any reasonable likelihood" standard.  It thus

appears that Petitioner has satisfied § 2254(d)(1).

Nevertheless, upon de novo review of Petitioner's Giglio claim, the undersigned

concludes that Petitioner has failed to show he is entitled to relief.  With respect to

Stacy Williams' testimony, Petitioner has failed to show that there is any reasonable

likelihood the jury's verdict was affected by it.  As previously discussed in the court's consideration of Petitioner's other grounds for relief, defense counsel destroyed Ms. Williams' credibility on cross-examination, which culminated in Williams' admission that she provided false sworn statements to law enforcement and to the court regarding the molestation charge.  There is no reasonable likelihood that the jury relied upon any of her testimony in finding Petitioner guilty of the molestation.

With respect to Petitioner's <u>Giglio</u> violation related to Michelle Zebracki's testimony, Petitioner alleges Ms. Zebracki committed perjury by testifying that the victim told her about the molestation after the victim told Charlotte Williams, the victim's grandmother (ECF No. 17 at 55–56).  Petitioner alleges the falsity of Ms. Zebracki's testimony is evidenced by DCF records dated November 25, 2011, which document a DCF investigator's interview with Ms. Zebracki, Jerry Weekley, and Charlotte Williams (*see* Ex. J at 896–97).  The investigator's narrative states, in relevant part:

> CPI [Child Protective Investigator] walked into the back room and Jerry Weekley and his fiancée Ms. Zebracki were in the room.  Jerry said she was having contractions and she may have to go to the hospital.  Ms. Zebracki said she is 26 weeks along.  CPI asked them about [the victim] being molested and Ms. Zebracki said [the victim] told her about the abuse she thinks on Monday.  She told the mother and the mother told her she was a liar.
> . . . .

> FF[face-to-face interview]/W/Charlotte Williams and she said no one
> told her [the victim] had been molested.  [The victim] has been staying
> with them and her mother has them for visitation.  Ms. Williams was
> very difficult to talk to as she was staring off into space.

(Ex. J at 896–97).

Petitioner additionally alleges Michelle Zebracki testified that the allegation

"came out" in July, August, and September of 2011.  Petitioner alleges the falsity of

this testimony is demonstrated by DCF records dated November 25, 2011, in which

the investigator indicated that Ms. Zebracki stated that the allegation "came out she

thinks" the previous Monday, November 21, 2011 (ECF No. 17 at 56).  Petitioner

additionally alleges CPT records stated that Jerry Weekley, Ms. Zebracki's fiancé,

told CPT Case Coordinator Leilani Mason that the victim told Ms. Zebracki about the

molestation on November 21, 2011 (*id.*; *see also* Ex. V at 99–101).  Petitioner alleges

both the State and defense counsel was aware of this "perjury" (*id.*).

The trial transcript shows that Ms. Zebracki's testimony was the following, in

relevant part:

> Q [by the prosecutor]. Back in November of—thereabouts
> November 2011, did [the victim] make some statements to you regarding
> Joseph Savicki?
>
> A.  Yes, ma'am.
>
> Q.  Where were these statements made?

A.  At her grandmother's house where I'm a resident at.

. . . .

Q.  And at some pont did [the victim] come to live there?

A.  She got with us September 5th of 2011.

. . . .

Q.  Now, when—where were you when [the victim] made these statements to you?

A.  I was outside at first.  She told the grandmother Charlotte Williams first.

Q.  And then how did you come to hear the statements?

A.  The grandmother was giving her a bath and she told her grandmother what Joe had supposedly done to her, and then the grandmother, I was outside smoking and she came out back and got me and brought me to [the victim].

. . . .

Q.  What statements did [the victim] make to you?

A.  I asked [the victim] to tell me what she told her grandmother, and she told me that—she was still living with her mother at that time and she told—

. . . .

Q.  Can you tell me what [the victim] told you?

A.  [The victim] told me that they were in the bedroom, that they were under—that Joseph had put the covers over both of them.  He unzipped his pants, took [the victim's] hand and put it on his privates and made her hand go up and down.

Q.  Did she demonstrate with her hand?

A.  Oh, yes, ma'am.

Q.  What did she demonstrate?

A.  She put her hands like this and did like the movement as you—

Q.  Do you remember what day that was?

A.  That she told me?

Q.  Yes.

A.  No, I do not.

Q.  What did you do?  Did you share that information with your boyfriend?

A.  Yes, I did.  I came in and told him what [the victim] told me.

Q.  And at some point did you share that information with the mother?

A.  Oh, yes, plenty of times.

. . . .

Q.  Were you present at Stacy's house when law enforcement responded there after she had called?

A.  Yes.

Q.  Did you go to the police station and give a written statement?

A.  Yes.

Q.  And was everything that you put in your written statement the truth?

A.  Yes.

(Ex. B at 153–58).

On cross-examination, Ms. Zebracki testified as follows:

Q [by defense counsel].  Had you told [Stacy] Williams about the allegations that [the victim] had made before the Thanksgiving holiday?

A.  Yes, sir.

Q.  Do you happen to recall—I realize we're talking about 2011—what day of the week that [the victim] went back to her mother's house?

A.  Oh, I have—I know it was like the day before Thanksgiving.

Q.  The day before Thanksgiving?

A.  Yes.

Q.  But at the time that [the victim] went back to spend Thanksgiving with her mother, [Stacy] Williams had already been notified of the allegations that [the victim] had made?

A.  Yes, sir.

. . . .

Q.  Did she give you any idea of when this was supposed to have occurred?

A.  No.

Q.  Did you ask her when it had occurred?

A.  Not that I recall, not sure.

Q.  Was she—but when she told you the story, she didn't say a week ago or two weeks ago or yesterday?

A.  No.

Q.  How long did you wait to tell [Stacy] Williams about these allegations when they came out?

A.  I called her that exact same day.

Q.  And, again, I realize we're talking about 2011.  Can you give me an approximation about how long before the Thanksgiving holiday was it that you had called her by the best of your recollection, and if you don't remember, that's fine.

A.  Somewhere in July and August because she started staying with us September the 5th so I think it was some time in July and August area.  I'm not a hundred percent sure.

Q.  To the best of your recollection, [Stacy] Williams took no action whatsoever between July and August and November?

A.  No.

(Ex. B at 159–61).

Defense counsel presented testimony of Jerry Weekley.  He testified as follows:

Q. Did [the victim] ever tell you about any allegations against Mr. Joseph Savicki?

A.  Yes, sir.

Q.  When did she tell you?

A.  I'm not sure of the month.  She said it was, like, September, October, somewhere in there.

Q.  When you were told that, what did you do?

A.  My first reaction, I called my sister up and told her what [the victim] just told me.

. . . .

Q.  I am asking you specifically, did you immediately call her?

A.  I immediately called her.

Q.  And was that prior to Thanksgiving in 2011?

A.  That was before Thanksgiving.

Q.  A significant amount of time before?

A.  Yes, sir.

(Ex. B at 188).

As previously discussed, a <u>Giglio</u> violation "exists 'when the <u>undisclosed</u> evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'" <u>Trepal v. Sec'y, Fla. Dep't of Corr.</u>, 684 F.3d 1088, 1107 (11th Cir. 2012) (quoting <u>Ventura</u>, 419 F.3d at 1276–77) (emphasis added). Here, Petitioner does not allege that evidence of Zebracki's "perjury" (e.g., the DCF and CPT investigative documents) was undisclosed to the defense prior to trial. Indeed, Petitioner admits that Ms. Zebracki "committed perjury known by both the State and counsel" (ECF No. 17 at 56). Therefore, Petitioner failed to show a <u>Giglio</u> violation. *See* <u>Ward v. Hall</u>, 592 F.3d 1144, 1183 (11th Cir. 2010) (there is no suppression of evidence if the defendant

knows of the information or had equal access to obtaining it); <u>Hammond v. Hall</u>, 586

F.3d 1289, 1309 (11th Cir. 2009) (<u>Giglio</u> claim fails because information not

suppressed).[9]

Additionally, Petitioner has not shown that the allegedly false testimony was

given with "willful intent" and "not as a result of mistake, confusion, or faulty

memory."  *See* <u>McNair</u>, 605 F.3d at 1208.

Moreover, the jury was aware of the inconsistency in Ms. Zebracki's testimony

with respect to when the victim told her about the molestation.  At the very beginning

of Ms. Zebracki's testimony, she testified that in November of 2011, the victim made

statements to her about the molestation.  Yet on cross-examination, Ms. Zebracki

stated that she told the victim's mother about the victim's disclosure "somewhere in

July and August."  Since the jury was aware of the inconsistency, there is no

reasonable likelihood that the allegedly false testimony could have affected the

judgment of the jury.

Petitioner failed to demonstrate he is entitled to federal habeas relief on Ground

Ten.

---

[9] When a federal habeas court reviews a <u>Giglio</u> claim de novo, the petitioner has the burden
of showing that there is a reasonable likelihood that the false testimony could have affected the
jury's verdict.  *See* <u>Trepal</u>, 684 F.3d at 1108.

I.    Ground Eleven:  "Florida Statute § 800.04.5b, under which Petitioner
was charged, is un-constitutional [sic], as it renders the Petitioner guilty until
proven innocent."

Petitioner alleges the statute under which he was charged violates the Fifth and

Fourteenth Amendments, because it places the burden of proof upon the defendant

(ECF No. 17 at 59–61).  Petitioner alleges the only direct evidence of his guilt was the

victim's testimony, but her testimony was less detailed than, and inconsistent with, her

original pre-trial allegation, which was admitted at trial through the victim's hearsay

statements (*id.*).  Petitioner alleges "the presumption of innocence was overcome by

the allegation before trial, and Petitioner absolutely had to put on a defense to prove

by a preponderance of the evidence that he was innocent" (*id.* at 61).

Petitioner concedes he did not exhaust his state court remedies with respect to

this claim (ECF No. 17 at 61–62).  He claims that there are no available state court

remedies to adequately present this issue (*id.*).

Respondent asserts an exhaustion defense (ECF No. 27 at 53–57).  Respondent

contends notwithstanding the failure to exhaust, the claim is without merit, because

Florida Statute § 800.04(5)(b) does not shift the burden of proof to the defendant  (*id.*

at 57–58).

In Petitioner's reply, he argues he that the cause of his failure to present the issue in his Rule 3.850 motion was ineffective assistance of post-conviction counsel (*see* ECF No. 32 at 73). Therefore, he is entitled to federal review of his claim under Martinez v. Ryan, 566 U.S. 1 (2012). Petitioner additionally argues that the court's failure to consider his claim on federal habeas will result in a fundamental miscarriage of justice (*id.* at 73–75).

The Eleventh Circuit has held that Martinez applies only to claims of ineffective assistance of trial counsel that are otherwise procedurally barred. *See* Gore v. Crews, 720 F.3d 811, 816 (11th Cir. 2013). Here, Petitioner's claim is a challenge to the constitutionality of the statute under which he was charged and convicted. Therefore, Martinez is inapplicable to this claim.

Moreover, notwithstanding Petitioner's failure to exhaust, his claim is without merit. The statute under which Petitioner was charged provides:

> (a) A person who intentionally touches in a lewd or lascivious manner the breasts, genitals, genital area, or buttocks, or the clothing covering them, of a person less than 16 years of age, or forces or entices a person under 16 years of age to so touch the perpetrator, commits lewd or lascivious molestation.

> (b) An offender 18 years of age or older who commits lewd or lascivious molestation against a victim less than 12 years of age commits a life felony, punishable as provided in s. 775.082(3)(a)4.

Fla. Stat. § 800.04(5).(a)–(b).  The statute does not relieve the State of its burden to prove each of the elements of the offense beyond a reasonable doubt, nor does it place upon the defendant the burden to present evidence or prove anything.  Indeed, the jury in Petitioner's case was instructed as follows, in relevant part:

> To prove the crime of lewd or lascivious molestation, <u>the state must prove</u> the following three elements beyond a reasonable doubt.
>
> Number one, PW was less than 12 years of age.  Number two, Joseph Glen Savicki intentionally forced or enticed PW to touch the genitals of Joseph Glen Savicki.  Number three, Joseph Glen Savicki was 18 years of age or older at the time of the offense.
> . . . .
> The defendant has entered a plea of not guilty.  This means that <u>you must presume or believe the defendant is innocent.</u>
> . . . .
> <u>The presumption stays with the defendant as to each material allegation</u> in the Information, that's the charging document, <u>through each stage of the trial</u> unless it has been overcome by the evidence to the exclusion of and beyond a reasonable doubt.
>
> To overcome the defendant's presumption of innocence, <u>the state has the burden of proving the crime with which the defendant is charged was committed, and the defendant is the person who committed the crime.</u>
>
> <u>The defendant is not required to present evidence or prove anything.</u>
> . . . .
> <u>The Constitution requires the state to prove its accusations against the defendant.  It is not necessary for the defendant to disapprove anything.  Nor is the defendant required to prove his innocence.  It is up to the state to prove the defendant's guilt by evidence.</u>

(Ex. C at 239–43) (emphasis added).

Petitioner has failed to show that the statute under which he was charged and convicted placed the burden upon him to demonstrate his innocence. Therefore, Petitioner is not entitled to federal habeas relief on Ground Eleven.

J.    Ground Twelve: "Newly discovered evidence that affects two issues of ineffective assistance of counsel, and a Brady violation"

Petitioner alleges that on March 30, 2017, he discovered that James Dean Dickerson was arrested on November 7, 2011, and charged in the Escambia County Circuit Court with six counts of lewd and lascivious behavior and multiple counts of contributing to the delinquency of a minor; and that Dickerson was convicted of on one of the lewd and lascivious behavior counts (ECF No. 17 at 62–68). Petitioner alleges this "newly discovered evidence" supports two IATC claims: (1) trial counsel was ineffective for failing to investigate, prepare, and introduce evidence that James Dean Dickerson could have committed the sexual molestation of the victim; and (2) trial counsel was ineffective for failing to inform Petitioner of the availability of this evidence, which affected Petitioner's choice of the defense theory and his decision not to testify. Petitioner alleges this "newly discovered evidence" also supports a Brady claim, i.e., that the State failed to disclose James Dean Dickerson's charges and conviction (id.). Petitioner states he presented this "newly discovered evidence" claim

to the state courts in his amended third successive Rule 3.850 motion (*id.* at 70). Petitioner contends the state court's adjudication of the claim is unreasonable (*see* ECF No. 32 at 78, 80–82).

Respondent concedes Petitioner's claim is technically exhausted by procedural bar (ECF No. 27 at 58–63). Respondent contends Petitioner presented claims of "newly discovered evidence" to the state courts in his first, second, and third successive Rule 3.850 motions, but in each instance, the state court determined that the alleged new evidence did not qualify as "newly discovered evidence" for purposes of Rule 3.850(b)(1); therefore, Petitioner failed to satisfy the exception to the two-year limitations period under that provision (*id.*). Respondent contends the state court's rejection of the "newly discovered evidence" claim asserted in Ground Twelve is entitled to deference (*id.* at 59–63).

In Petitioner's amended third successive Rule 3.850 motion, he argued that he was innocent of the crime, and that "newly discovered evidence" would show that his trial counsel was ineffective and that the State knowingly withheld exculpatory evidence from the defense (Ex. DD at 944–63). Petitioner alleged that the "newly discovered evidence" was evidence that on November 4, 2011, James Dean Dickerson was charged in Escambia County, Florida, with six counts of lewd and lascivious

behavior on a different victim, and on August 21, 2012, Dickerson pleaded guilty to one of the charges (*id.*).  Petitioner alleged that on August 28, 2011, Dickerson "had been caught kissing the Defendant's AV [alleged victim] while she was asleep on the couch in the living room in the same apartment where the allegation against the Defendant is to have taken place" (*id.* at 948).  Petitioner alleged he was unaware of Mr. Dickerson's charges until March 30, 2017, when his mother conducted a Google search and discovered that Dickerson was a registered sex offender (*id.*).

Petitioner alleged that his trial counsel, Attorney Weekley, admitted he did not investigate Mr. Dickerson as the possible perpetrator in Petitioner's case (Ex. DD at 948).  Petitioner alleged that one of the DCF reports showed that the child protective investigator questioned Stacy Williams about "James," and Ms. Williams stated that James had kissed the victim and the police knew about it (*id.* at 950).  Petitioner alleged that the same DCF report showed that Petitioner told the investigator about the kissing incident, and Petitioner told the investigator that the victim "must be referring to James" in her allegation of molestation (*id.*).  Petitioner alleged that in one of the State's discovery exhibits, titled "Investigative Summary," the DCF investigator provided details of the kissing incident with Mr. Dickerson (*id.* at 951).  Petitioner alleges he also referenced the incident in his written statement to police (*id.*).

As one of the exhibits to the amended third successive Rule 3.850 motion,

Petitioner submitted the Amended Discovery Exhibit in which the State provided DCF

Chronological Notes Reports to the defense on October 3, 2012 (Ex. DD at 973–82).

The DCF report includes notes from the investigator's contact with Stacy Williams

on December 7, 2011. The notes include the following:

> CPI [child protective investigator] asked her [Stacy Williams] about a guy named James and she said he was a friend of a friend and he kissed [the victim.] she has no idea why he did it but it was reported to Milton PD and they will know the guys [sic] name.

(Ex. DD at 979).

The report also includes notes from the DCF investigator's contact with the

victim, on December 7, 2011. The notes include the following:

> CPI asked her [the victim] if anyone lived with her mother [Stacy Williams] and she said just Joe. CPI asked if she knew anyone named James and she said she did not. She asked if it was a white guy or a black guy and CPI said a white guy. She said she doesn't know anyone named James and no one has done anything to her other than Joe.

(Ex. DD at 980–81).

Petitioner claimed that the "newly discovered evidence" of James Dickerson's

arrest and conviction supported two claims of IATC: (1) counsel failed to investigate,

prepare, and introduce evidence that James Dean Dickerson could have committed the

offense; and (2) counsel failed to inform Petitioner of the availability of the defense

theory that Dickerson could have committed the sexual molestation, which affected

Petitioner's choice of defense theory and his decision not to testify (Ex. DD at

952–60).  Petitioner also claimed that this "newly discovered evidence" supported a

Brady claim (*id.* at 951, 960–61).  Petitioner alleged that the State knew that Mr.

Dickerson's charges in Escambia County "tend[ed] to negate" Petitioner's guilt (*id.*).

Petitioner alleged the State "had direct control over the charges and prosecution of Mr.

Dickerson" but never disclosed the existence of Dickerson's charges (*id.*).

The state court adjudicated the motion as follows:

> In his third successive motion, Defendant brings a claim of newly discovered evidence based on his discovery of a roommate's conviction of lewd and lascivious molestation and a *Brady*[FN 1] violation based on the newly discovered evidence.  In his amended 3rd successive motion, Defendant adds two claims of ineffective assistance of counsel based on newly discovered evidence related to his discovery of the roommate's conviction.  He claims that trial counsel was ineffective for failing to investigate, discover, and present this information at his trial to argue that the roommate molested the victim.  Defendant also claims that trial counsel's advice regarding whether he should testify at trial was deficient and rendered him "completely uninformed."  After reviewing the motion, the record, and the applicable law, the Court finds that Defendant is not entitled to relief.

> [FN 1:  *Brady v. Maryland*, 373 U.S. 83 (1963).

> ## NEWLY DISCOVERED EVIDENCE

> Defendant filed his third successive motion for postconviction relief (and subsequent amended motion) more than two years after his

judgment and sentence became final;[FN 2] therefore, his motion may only proceed under one of the exceptions outlined in Fla. R. Crim. P. 3.850(b). Defendant relies on Fla. R. Crim. P. 3.850(b)(l), namely the exception regarding newly discovered evidence. To deem evidence newly discovered, the asserted facts upon which the evidence is based "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence." *Jones v. State*, 591 So. 2d 911, 916 (Fla. 1991) (citing *Hallman v. State*, 371 So. 2d 482, 485 (Fla. 1979)). Additionally, "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." *Id.* at 915 (emphasis omitted).

[FN 2: *Savicki v. State*, 1D13-2951 (Fla. 1st DCA June 2, 2014).]

Defendant alleges that he recently discovered that James Dean Dickerson, one of the roommates at the house in which Defendant and the victim were residing at the time of his arrest, had been convicted of lewd and lascivious molestation in Escambia County on August 21, 2012. Defendant alleges that he could not have discovered Mr. Dickerson's conviction because he does not have internet access in prison and must rely on others to help him. Defendant asserts that he was unaware of this information until his mother discovered it via a Google search on March 30, 2017 and that this motion is filed within two years of discovering the information. He avers that he exercised due diligence by informing trial counsel prior to trial of an incident between the victim and Mr. Dickerson in which he caught Mr. Dickerson kissing the victim "like a man kisses a woman," and he relied on trial counsel to investigate Mr. Dickerson. Defendant contends that trial counsel could have used this information to argue that Mr. Dickerson had molested the victim.

Contrary to Defendant's allegations, information regarding Mr. Dickerson's August 2012 conviction was available prior to Defendant's trial on May 23, 2013, and could have been discovered at the time of

trial, or within two years of his judgment and sentence. Thus, Mr. Dickerson's conviction is not newly discovered evidence. *See Lamb v. State*, 212 So. 3d 1108, 1111 (Fla. 5th DCA 2017) (determining that the victim's criminal conviction could have been obtained within two years of the judgment and sentence of the defendant and thus did not constitute newly discovered evidence).

In addition, the newly discovered evidence must have been unknown and not discoverable by due diligence by Defendant or his trial counsel. "[T]he facts on which the claim is predicated were unknown to the movant *or the movant's attorney* and could not have been ascertained by the exercise of due diligence . . . ." Fla. R. Crim. P. 3.850(b)(l) (emphasis added). Defendant's trial counsel could have discovered Mr. Dickerson's conviction with due diligence had that information been pertinent to Defendant's theory of defense. At the evidentiary hearing on Defendant's initial motion for postconviction relief, trial counsel testified that there were several alternative theories to Defendant's case, namely, blaming Mr. Dickerson, arguing that the allegations were fabricated, and attacking the credibility of the victim and her mother.[FN 3] Trial counsel testified that they rejected the theory of blaming Mr. Dickerson because the allegation against Mr. Dickerson was different from the allegation against Defendant.[FN 4] Even though trial counsel chose not to pursue the theory of blaming Mr. Dickerson, trial counsel had the capacity to discover Mr. Dickerson's conviction, and thus, Defendant's discovery of Mr. Dickerson's conviction is not newly discovered evidence.

[FN 3: Exhibit A, Tr. 22.]

[FN 4: *Id.*]

Secondly, in order for evidence to be deemed newly discovered, the evidence must be of a nature that it would probably result in the acquittal of Defendant on retrial. Evidence of Mr. Dickerson's conviction, if admissible at trial, would merely support the theory that he molested the victim rather than Defendant, as discussed in the Court's

order on Defendant's initial motion for postconviction relief.[FN 5] Trial counsel testified that, after consideration, they elected not to pursue this theory.  In fact, at the evidentiary hearing, trial counsel testified that the theory that Defendant chose, which was to attack the credibility of the victim and her mother, was the best theory of defense given the facts of the case."  Based on the record, the Court does not conclude that introducing evidence of Mr. Dickerson's conviction of inappropriate contact with a different victim would result in an acquittal on retrial. Consequently, the Court finds that Mr. Dickerson's conviction does not qualify as newly discovered evidence, and Defendant's motion is untimely.[FN 7]  Fla. R. Crim. P. 3.850(b).

> [FN 5:  Exhibit B, Order Den. Def.'s *Pro Se* Second Am. Mot. for Postconviction Relief (without exhibits) 22–23]

> [FN 6:  Exhibit A, Tr. 39.]

> [FN 7: As the motion is untimely, the Court will not consider Defendant's claims of ineffective assistance of counsel based on the discovery of Mr. Dickerson's conviction in Escambia County.  In addition, the Court would note that it is illogical for trial counsel to have rendered ineffective assistance of counsel based on newly discovered evidence as a claim of newly discovered evidence requires trial counsel to have been unaware of the information and unable to discover the information with due diligence.]

## *BRADY* VIOLATION

To establish a *Brady* violation, a defendant must allege facts that demonstrate that "(l) the State possessed evidence favorable to the accused because it was either exculpatory or impeaching; (2) the State willfully or inadvertently suppressed the evidence; and (3) the defendant was prejudiced." *Allen v. State*, 854 So. 2d 1255, 1259 (Fla. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).  To establish

prejudice, a defendant must demonstrate that the evidence was material by showing that the results of the proceeding would have been different if the evidence had been disclosed to the defense. *Id.* at 1260 (citing *Strickler*, 527 U.S. at 280).

Defendant argues that the evidence of Mr. Dickerson's conviction in Escambia County was exculpatory because it could have given the jury reasonable doubt as to whether Defendant or Mr. Dickerson molested the victim. He claims that the evidence was suppressed by the State because the State had prosecuted Mr. Dickerson in Escambia County, and he states that he made the State aware of the "kissing incident" on October 24, 2014, when he filed his second amended 3.850 motion for postconviction relief and again on August 18, 2015, during the evidentiary hearing on his motion. Defendant also argues that the State was aware of the "kissing incident" through the activities of the Milton Police Department, which processed the complaint made by Defendant regarding the "kissing incident." Finally, Defendant claims that he was prejudiced because trial counsel could have argued that Mr. Dickerson could have molested the victim during the "kissing incident" or that the victim's mother or Mr. Dickerson himself manipulated her to identify Defendant rather than Mr. Dickerson as the one who molested her. In addition, he points out that trial counsel stated that evidence of Mr. Dickerson's conviction "would have been helpful" had they decided on the defense theory of blaming Mr. Dickerson.

Defendant has failed to establish a *Brady* violation. Although the State prosecuted Mr. Dickerson in Escambia County and would have been aware of the "kissing incident" through the Milton Police Department as Defendant alleges in his motion, Defendant has made no showing that the State was aware of any significance of Mr. Dickerson's convictions in relation to his case until be raised the issue in his second amended motion, filed on October 24, 2014, more than one year after his trial. Thus, Defendant has failed to show that the State possessed exculpatory information that would have benefited [sic] the defense at trial. Secondly, given the Court's conclusion that the conviction could have been discovered at the time of trial, the Court does not conclude

that suppression occurred.  In addition, Defendant has failed to show the materiality of the evidence as "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *U.S. v. Agurs*, 427 U.S. 97, 109–10 (1976).  Consequently, the Court finds that this claim should be denied.

(Ex. DD at 985–91).  The First DCA affirmed the decision without written opinion.

To the extent Petitioner challenges the state court's adjudication of the merits of his Brady claim, for the reasons discussed *supra* in Ground Nine, Petitioner has failed to establish a Brady violation with respect to the State's alleged suppression of information regarding Mr. Dickerson's arrest and conviction.  Therefore, Petitioner is not entitled to habeas relief on his Brady claim.

To the extent Petitioner seeks federal review of the merits of the two new IATC claims (i.e., that trial counsel was ineffective for failing to investigate James Dean Dickerson's arrest and conviction, and failing to inform Petitioner of this information so that he could make an informed decision as to the defense theory he wished to pursue and whether or not he wished to testify at trial), the state court did not adjudicate the merits of those claims.  Indeed, the state court expressly stated, in a footnote, that it would not consider the merits of Petitioner's IATC claims, because the claims were untimely (*see* Ex. DD at 988 n.7).

"[I]f state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review . . . those remedies are technically exhausted, . . . but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court.  Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding."  Woodford v. Ngo, 548 U.S. 81, 93, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) (citations omitted); *see also* Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts.").  A claim is considered procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).  In such a case, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id.*.  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal

question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.  *Id.*  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  *Id.*  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

Here, the first two parts of the Judd test are clearly satisfied.  First, the state court clearly and expressly stated that it would not consider Petitioner's new IATC claims, because Petitioner failed to show that they were based upon "newly discovered evidence" and they were thus untimely under Rule 3.850(b)(1).  Second, the state court's decision on the procedural issue rested entirely on state law grounds and was not intertwined with an interpretation of federal law.

Petitioner appears to argue that the third part of the <u>Judd</u> test is not satisfied, because the state court applied Rule 3.850(b)(1) in an arbitrary fashion (*see* ECF No. 32 at 80–81).  Citing <u>Bailey v. State</u>, 768 So. 2d 508 (Fla. 2d DCA 2000), Petitioner argues that the state court arbitrarily determined that evidence of Mr. Dickerson's arrest and conviction was not "newly discovered" because Petitioner's trial counsel could have discovered it with due diligence (*id.* at 80).

In <u>Bailey</u>, the trial court summarily denied Bailey's Rule 3.850 motion as untimely and not within one of the exceptions to the two-year time limit set out in Rule 3.850(b)(1).  768 So. 2d at 509.  Bailey alleged that through repeated discovery requests he received <u>Brady</u> material from the State that was not produced to his trial attorney, and the documents attached to the Rule 3.850 motion supported this contention.  *Id.*  This material consisted of a field interview report prepared by a sheriff's deputy, several offense reports prepared by sheriff's deputies, and other documents.  *Id.*  Bailey alleged that the information in those documents could have been used to impeach a key witness against him, and that his attorney was ineffective for failing to discover these documents.  *Id.*  The Second DCA noted that the fact that the police reports were in existence at the time of the trial would usually foreclose using these reports as newly discovered evidence to warrant an exception to the

two-year time limit set forth in Rule 3.850(b)(1).  *Id.*  However, the court found the case analogous to <u>Porter v. State</u>, 670 So. 2d 1126 (Fla. 2d DCA 1996), in which the Second DCA found that a claim of ineffective assistance of counsel for failure to discover certain police reports was facially sufficient even though it was filed well after the two-year time limit, because "the defendant 'cannot be charged with constructive knowledge of [the police report's] availability since his ineffective assistance claim assails counsel for failing to discover the evidence.'"  *Id.* (quoting <u>Porter</u>, 670 So. 2d at 1127).  The Second DCA remanded the case to the trial court for further proceedings. *Id.*

But the facts of <u>Bailey</u> and <u>Porter</u> are materially distinguishable from the facts in Petitioner's case, in that the evidence at issue in Petitioner's case (i.e., evidence that James Dean Dickerson was convicted of lewd and lascivious conduct in August of 2012) was <u>publically</u> available at the time of Petitioner's trial and thereafter.  Indeed, Petitioner alleged, in his amended third successive Rule 3.850 motion, that his mother discovered the information about Mr. Dickerson's conviction by conducting a Google search, which revealed that Mr. Dickerson was a sexual predator (Ex. DD at 947–49).  Thus Petitioner himself could have known of Mr. Dickerson's conviction by the use of diligence.  *See* <u>Porter v. State</u>, 653 So. 2d 374, 378 (Fla. 1995) (claim that trial

counsel had conflict of interest because counsel simultaneously represented petitioner and key prosecution witness was not based upon newly discovered evidence, as was necessary for it to be basis of successful post-conviction relief motion filed after expiration of applicable time limits, as court records upon which claim was based were public records continually available throughout all post-conviction relief proceedings), *called into doubt on other grounds by* Wyatt v. State, 71 So. 3d 86, 100 n.13 (Fla. 2011).

Information that Mr. Dickerson was a convicted sex offender, and the date of his conviction, was continuously publicly available since 2012 through the Florida Department of Law Enforcement. *See* Fla. Stat. § 775.21(5)(a)2. ("An offender who meets the sexual predator criteria described in paragraph (4)(a) who is before the court for sentencing for a current offense committed on or after October 1, 1993, is a sexual predator, and the sentencing court must make a written finding at the time of sentencing that the offender is a sexual predator, and the clerk of the court shall transmit a copy of the order containing the written finding to the department [of law enforcement] within 48 hours after the entry of the order."); Fla. Stat. § 775.21(6)(b) ("If the sexual predator is in the custody or control of, or under the supervision of, the Department of Corrections, . . . the sexual predator shall register with the Department

of Corrections."); Fla. Stat. § 775.21(6)(k)1. ("The department [of law enforcement] is responsible for the online maintenance of current information regarding each registered sexual predator."); Fla. Stat. § 775.21(6)(k)2. ("The department's sexual predator registration list, containing the information described in subparagraph (a)1., is a public record, . . . . The department may disseminate this public information by any means deemed appropriate, including operating a toll-free telephone number for this purpose.).  Additionally, the date and nature or Mr. Dickerson's conviction information was continuously publically available since 2012 from the Escambia County Clerk of Court and the Florida Department of Corrections.

Moreover, according to public records of the Escambia County Clerk of Court, Mr. Dickerson was charged with the lewd and lascivious conduct in Case No. 2011-CF-005649, on December 16, 2011.  This was prior to Petitioner's arrest on March 8, 2012.  Because Petitioner himself could have discovered, with due diligence, evidence of Mr. Dickerson's arrest and conviction for lewd and lascivious conduct, Petitioner failed to show that the state post-conviction court arbitrarily applied Rule 3.850(b)(1) in determining that his amended third successive Rule 3.850 motion was untimely. Therefore, this federal court must honor the state's procedural default rule.

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. Coleman, 501 U.S. at 750. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).

As cause for the procedural default, Petitioner argues his post-conviction counsel in the first Rule 3.850 proceeding (Mr. Early) was ineffective for failing to investigate Mr. Dickerson's arrest and conviction (ECF No. 32 at 82). Petitioner contends this constitutes cause under Martinez v. Ryan, 566 U.S. 1 (2012).

Before its decision in Martinez, the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by their state collateral counsel to establish cause. See Coleman, 501 U.S. at 752–53. Martinez created a limited, equitable exception to Coleman where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding,

where the claim should have been raised, was ineffective under the standards of Strickland [v. Washington, 466 U.S. 668 (1984)]"; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." Martinez, 566 U.S. at 14 (citations omitted).

In Petitioner's first Rule 3.850 proceeding, where the two new IATC claims should have been raised, Petitioner was initially appointed counsel (see Ex. I at 674–77, 682). However, at the beginning of the evidentiary hearing, Petitioner insisted on representing himself even after the court explained some of the ways that representation by counsel could be to Petitioner's advantage, including that a lawyer had fewer limitations and restrictions on researching Petitioner's claims (see id. at 731–51). Moreover, as discussed supra, evidence of Mr. Dickerson's arrest and conviction was publicly available at the time Petitioner commenced the first Rule 3.850 proceeding on June 6, 2014. Therefore, Petitioner has failed to demonstrate he qualifies for de novo review of his IATC claims under the "cause and prejudice" exception to the procedural bar.

Petitioner also contends he is entitled to a merits review of his two new IATC claims under the "actual innocence" exception (see ECF No. 32 at 81–82). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional

violation has probably resulted in the conviction of one who is actually innocent."

Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To

establish the requisite probability, the petitioner must show that it is more likely than

not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327.

Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

Here, evidence that James Dean Dickerson was arrested on several counts of

lewd and lascivious conduct on a different victim during the same month that

Petitioner was arrested, and that Mr. Dickerson was convicted on one of the counts,

does not constitute reliable evidence that Petitioner did not place the victim's hand on

his bare penis and move her hand back and forth. Therefore, Petitioner failed to

demonstrate he is entitled to federal merits review of the two procedurally defaulted

IATC claims presented in Ground Twelve.

## IV.    MOTION TO APPOINT COUNSEL AND FOR DISCOVERY

As a final matter, the court will address Petitioner's "Request for Discovery, Appointment of Counsel, Funds for Investigator" (ECF No. 35) and "Amendment to Request for Appointment of Counsel, Funds for Investigator, and Depositions be [sic] Transcribed" (ECF No. 36).  Petitioner requests that the court appoint counsel to represent him, and allocate funds to hire an investigator and transcribe the pre-trial depositions of Stacy Williams, Michelle Zebracki, and Jerry Weekley.

The appointment of counsel in civil cases is not a constitutional right; rather, it is "a privilege that is justified only by exceptional circumstances, such as where the facts and legal issues are so novel or complex as to require the assistance of a trained practitioner."  Poole v. Lambert, 819 F.2d 1025, 1028 (11th Cir. 1987).  This rule extends to post-conviction proceedings.  Pennsylvania v. Finley, 481 U.S. 551, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987); Fowler v. Jones, 899 F.2d 1088 (11th Cir. 1990).

Additionally, although federal statutes bestow upon indigent state capital defendants a mandatory right to counsel, state non-capital defendants have no equivalent right to the appointment of counsel in federal habeas corpus proceedings. *See* 18 U.S.C. § 3599(a)(2); *see also* McFarland v. Scott, 512 U.S. 849, 857 n.3, 114

S. Ct. 2568, 129 L. Ed. 2d 666 (1994) (citing § 3599(a)(2)'s predecessor rule, 21 U.S.C. § 848(q)(4)(B)).

Federal courts do, however, have <u>discretionary</u> statutory authority to appoint counsel to state non-capital defendants in habeas corpus actions. *See* 28 § 2254(h). Further, the Criminal Justice Act (CJA), 18 U.S.C. § 3006A, provides in relevant part: "Whenever the United States magistrate judge or the court determines that the interests of justice so require, representation may be provided for any financially eligible person who . . . is seeking relief under section 2241, 2254, or 2255 of title 28." 18 U.S.C. § 3006A(a)(2)(B).

The procedural rules governing § 2254 cases require the appointment of counsel in two circumstances: (1) where the court has authorized discovery upon a showing of good cause, and appointment of counsel is necessary for effective discovery, and (2) where the court has determined that an evidentiary hearing is warranted. *See* Rules 6(a), 8(c), Rules Governing Section 2254 Cases.

As a practical matter, the Supreme Court's decision in <u>Cullen v. Pinholster</u>, 563 U.S. 170, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), places restrictions on discovery and expansion of the record in federal habeas cases. In <u>Pinholster</u>, the Court made it clear that, "[a]lthough state prisoners may sometimes submit new evidence in federal

court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." 563 U.S. at 186. The Court addressed whether habeas review "under § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal court." *Id.* at 181. The Court held that when the state court has decided an issue on the merits, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* Likewise, based on the plain language in the statute itself, review under § 2254(d)(2) is limited to "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); Pinholster, 563 U.S. at 185 n.7.

"In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2) [or Pinholster], the decision to grant such a hearing rests in the discretion of the district court." Schriro v. Landrigan, 550 U.S. 465, 468, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007); *see also* Rule 8, Rules Governing Section 2254 Cases. When deciding whether to grant a hearing, the "court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations," taking into consideration the "deferential standards prescribed by 28 U.S.C. § 2254." Schriro, 550 U.S. at 474. An evidentiary

hearing is not necessary if the issues can be resolved by reference to the record developed in the state courts.  *Id.*

While Pinholster addressed evidentiary hearings, district courts have found that its linkage to  discovery is unquestionably present.  *See, e.g.*, Butts v. Chatman, No. 5:13cv194 (MTT), 2014 WL 185339, at *1 n.2 (M.D. Ga. Jan. 15, 2014) (unpublished) (while Pinholster addressed only evidentiary hearings, there would be no need for discovery if Pinholster barred the court from considering any newly discovered evidence); Coddington v. Cullen, No. CIV–S–01–1290 KJM GGH DP, 2011 WL 2118855 (E.D. Cal. May 27, 2011) (unpublished) (explaining that "the extent of permissible discovery in a habeas corpus action, seemingly once settled, has been upset by the AEDPA ruling of . . . [Pinholster]").  After Pinholster, if the state court decided a particular claim on the merits, this court is not authorized to hold an evidentiary hearing in which new evidence is introduced to support that claim.  Thus, it would seem that obtaining discovery on that claim would be futile.  Courts faced with discovery requests post-Pinholster have explained:

> [A]ny new evidence unearthed during discovery in federal court and "later introduced in federal court is irrelevant to § 2254(d)(1) [and (2)] review."  In other words, if the state trial court adjudicated . . . [petitioner's claims] on the merits, such that [p]etitioner must satisfy the terms of § 2254(d), "good cause" does not exist for the discovery

[p]etitioner seeks . . . because this Court may look only to the state court record in applying § 2254(d).

Hurst v. Branker, No. 1:10–CV–725, 2011 WL 2149470 (M.D.N.C. June 1, 2011) (unpublished) (quoting Pinholster, 131 S. Ct. at 1400).

With respect to Petitioner's § 2254 claims that were adjudicated on the merits in state court (i.e., Grounds Two though Eight, and one of the Brady claims presented in Ground Nine), the undersigned has concluded that Petitioner has not satisfied § 2254(d); therefore, neither discovery nor an evidentiary hearing is appropriate as to those claims. With respect to Petitioner's remaining claims, Petitioner has not shown that further factual development would enable him to demonstrate entitlement to relief. Therefore, Petitioner's motions for appointment of counsel and discovery should be denied.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  Buck v. Davis, 580 U.S.—, 137 S. Ct. 773 (2017) (citing Miller-El, 537 U.S. at 327).  Here, Petitioner cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the amended petition for writ of habeas corpus (ECF No. 17) be

**DENIED**.

2.    That Petitioner's "Request for Discovery, Appointment of Counsel, Funds for Investigator" (ECF No. 35) and "Amendment to Request for Appointment of Counsel, Funds for Investigator, and Depositions be [sic] Transcribed" (ECF No. 36) be **DENIED**.

3.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 9th day of July 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**